BOSTON SAFE DEPOSIT AND TRUST COMPANY, trustee, *vs.* DENISE FLEMING & others.

Suffolk. February 1, June 7, 1971. — February 15, 1972.

Present: TAURO, C.J., CUTTER, SPIEGEL, REARDON, QUIRICO, BRAUCHER, & HENNESSEY, JJ.

*Adoption. Devise and Legacy,* Adopted child, Issue. *Conflict of Laws. Constitutional Law,* Equal protection of laws. *Words,* "Issue."

The validity and effect of a will and trust are to be determined by the law of the testator's domicil in the absence of an indication that the testator intended some other law to be applied. [176]

The rights of an adopted person under a will admitted to probate in this Commonwealth, where the testator was domiciled at his death, are to be determined not by the law of California, where the adoption occurred, but by the law of Massachusetts. [176]

Where a testator left his property in trust for his daughter for her life with a provision that at her death it was to go to her issue or, if

---

there were no issue, in equal shares to six named charities, and where, after the testator's death, the daughter married and had no children of her own but subsequently adopted two, it was held that the governing statute was G. L. c. 210, § 8, as it stood before its amendment by St. 1958, c. 121, § 1, and that, construing the governing statute in the light of the decisions, the word "issue" in the testator's will did not include children adopted by someone other than the testator; the judge correctly ruled that the property was to go to the six named charities. [178–183] BRAUCHER, J., with whom TAURO, C.J., and SPIEGEL, J., joined, dissenting.

PETITION filed in the Probate Court for the county of Suffolk on July 10, 1969.

The case was heard by *Wilson,* J.

*Walter G. Van Dorn* for Denise Fleming & another.

*Harris A. Reynolds* for Rogerson House.

*Albert M. Fortier, Jr.,* for The New England Hospital.

*Mark A. Michelson* for The Home for Aged Women.

*James J. Kelleher,* Assistant Attorney General, for the Attorney General.

*John V. Phelan,* for the petitioner, submitted a brief.

CUTTER, J.   This petition seeks instructions about the distribution of the corpus of a trust under the will of James C. Whitmore (the testator) upon the death on January 5, 1969, of his daughter, Grace W. Fleming (Grace).   A decree of the Probate Court ordered distribution to six charitable corporations in equal shares. Grace's adopted children, John W. and Denise Fleming, appealed.   The case is before us on a statement of agreed facts, a report of material facts, and the reported evidence.[1]

On June 16, 1901, the testator died at age sixty-eight, a

---

[1] On April 16, 1971, an opinion in this case was released by this court which in general adopted the position of the present dissenting opinion.  Upon requests for rehearing by the Attorney General and three of the charities, greatly amplified briefs were submitted.   In accordance with S. J. C. Rule 1:18 (351 Mass. 741), all the then justices were requested to consider (without reargument) the question of law presented by the record, original briefs, and supplemental briefs.  The original opinion was then recalled to await the argument on December 10, 1971, of two cases supposedly presenting a some-

resident of Boston.   His will, dated January 25, 1899, was admitted to probate on July 11, 1901.   It divided the residue of his estate into two equal portions.   One portion was to be held in trust to pay the income (and if necessary principal) to his wife, until her death, when the principal (with accretions) was to be added to the second portion if Grace was then living.   If Grace was not then living, the first portion was to be dividend equally among six Boston charitable corporations.   The second portion was to be held in trust to pay the income to Grace until her death, when the principal (and accretions) were to be paid (emphasis supplied) "to and among her *issue* then living, equally; and if no such issue is then living, then to divide . . . [the] principal and accretions equally among the" same six charitable corporations.

Grace, born in March, 1879, was the child by blood of the marriage of the testator and his wife, and was twenty-two at the testator's death in 1901.   She married John F. Fleming in 1909.   They resided continuously in California from 1916 until their respective deaths.   In 1917 they adopted John W. Fleming, then one year old.   In 1924 they adopted Denise Fleming, then six.   Both adopted children were thereafter raised in their household as their children.   On July 15, 1938, the testator's widow died. The principal of the trust, formerly held for the widow, was added to the trust held for Grace under the will.

Subject to exception, John W. Fleming testified that Grace had told him on some twenty occasions over thirty years of numerous statements by the testator that he had no direct knowledge of the six charitable organizations named in the will, and that they were suggested to him by "the person who drew his will as being reputable organizations."   The judge ruled inadmissible an offer of

what related issue.   See *Billings* v. *Fowler, post,* 230, and *Boston Safe Deposit & Trust Company* v. *Dean, post,* 244.   The present case has now (February, 1972) been fully reconsidered (on all the documents mentioned above) by all the present justices.   A majority of the court now direct that the original opinion (reported Mass. Adv. Sh. [1971] 643) be replaced by the present opinion and that a new rescript is to issue.

proof that the reports of three of the charitable organizations did not disclose the testator's name as a contributor, officer, or participant during his life.

## THE STATUTES.

The judge ruled that the case was governed by G. L. c. 210, § 8, as it stood before its amendment by St. 1958, c. 121, § 1. The predecessor statute in 1901, Pub. Sts. c. 148, § 8, reads as follows: "The term child, or its equivalent, in a . . . devise or bequest, shall be held to include a child adopted by the . . . testator, unless the contrary plainly appears by the terms of the instrument; but when the . . . testator is not himself the adopting parent, the child by adoption shall not have, under such an instrument, the rights of a child born in lawful wedlock to the adopting parent, unless it plainly appears to have been the intention of the . . . testator to include an adopted child." Section 8 remained unchanged (except in trivial respects) in the Revised Laws (1902) and in the General Laws (1921), and thereafter until 1958.

Section 1 of the 1958 amendment entirely changed c. 210, § 8, to read: "The word 'child,' or its equivalent, in a . . . devise or bequest shall include an adopted child to the same extent as if born to the adopting parent or parents in lawful wedlock unless the contrary plainly appears by the terms of the instrument." Section 2 of the 1958 act, however, confined the application of the amendment to instruments executed after its effective date.[2] Section 8 was again rewritten by St. 1969, c. 27, pertinent portions of which are set out in the margin.[3]

[2] Statute 1958, c. 121, § 2, reads: "The provisions of . . . [G. L. c. 210, § 8] as amended by section one of this act shall be applicable *only* to . . . devises or bequests executed after the effective date of this act" (emphasis supplied).

[3] Chapter 27, § 1, revised § 8, to read: "The words 'child', 'grandchild', 'issue', 'heir', or 'heir-at-law', or their respective equivalents, in a . . . devise or bequest, shall include one who is adopted to the same extent as if born to the adopting parent or parents in lawful wedlock, whether the adoption was decreed before or after the date of execution or the effective date of any such . . . devise or bequest, unless the contrary plainly appears by the terms of the instrument." Section 2 of the 1969 amendment provided that § 8 "as amended by section

Because the interests now discussed vested at the latest at Grace's death on January 5, 1969, prior to the effective date of the 1969 amendment (and arose under an instrument executed before August 26, 1958), the 1969 amendments are not directly applicable to the present situation.

1. The validity and effect of the will and trust are to be determined by the law of Massachusetts, the testator's domicil at his death. In the absence of indication that the testator intended some other law to be applied, the will is to be interpreted and construed in accordance with Massachusetts law. See *Second Bank-State St. Trust Co.* v. *Weston,* 342 Mass. 630, 635–636, and authorities cited. See also Restatement 2d: Conflict of Laws, §§ 268, 269. The will and G. L. c. 210, § 8, make no reference to the law of any other State.

In the present situation, the question for decision is whether under c. 210, § 8,[4] as it read prior to the 1958 amendment, the two Flemings adopted in California, can be included within the term "issue" as used by the testator in his will, interpreted and construed in accordance with Massachusetts law. See *Hutchins* v. *Browne,* 253 Mass. 55, 58–59; *Bundy* v. *United States Trust Co.* 257 Mass. 72, 80 ("The question is not one of the legal effect of the adoption under the laws of the State of . . . [California], but of the meaning of . . . [the testatrix's] will under the laws of this Commonwealth."). See also *Estate of Stanford,* 49 Cal. 2d 120, 142 (indicating that the California court would apply Massachusetts law in this case), and *In re Cheney's Estate,* 109 N. Y. S. 2d 704 (Spec. Term), where a New York court applied Massachusetts law to a child adopted in Georgia.

---

one of this act, shall be applicable to all . . . devises or bequests whether the same were executed or effective before or after the effective date of this act provided that said provisions shall not apply to any such . . . devise or bequest which was executed or effective prior to August . . . [26, 1958] with respect to any interests or right therein which had vested prior to the effective date of this act." By § 3 of the 1969 act it was to "take effect on September" 1, 1969.

[4] The present record shows no occasion for us now to consider the effect of G. L. (Ter. Ed.) c. 210, § 9, either before or after its amendment by St. 1967, c. 113. See *Cobb* v. *Old Colony Trust Co.,* 295 Mass. 338, 342–343; *Arnold* v. *Helmer,* 327 Mass. 722, 723.

2. "The effect of adoption upon the status of . . . parties and upon the rights of descent and distribution of their property in case of intestate death is governed by statute." *Cobb* v. *Old Colony Trust Co.* 295 Mass. 338, 340. Under the first adoption statute, St. 1851, c. 324, §§ 1–8 [5] (as amended in other respects by St. 1871, c. 310, § 8), it was held in 1874 in *Sewall* v. *Roberts*, 115 Mass. 262, 276–277, that a child, adopted in 1865 by the settlor of an irrevocable 1825 trust, took as a "child" or "issue" of the settlor. Thereafter, the Legislature enacted by St. 1876, c. 213, § 9, substantially the provision found in G. L. c. 210, § 8, prior to the 1958 amendment. This enactment, however, was subject to a proviso, "that nothing in this act shall be construed to restrict any right to the succession to property which may have vested in any person already adopted in accordance with the laws of this Commonwealth." Recognizing the force of this proviso, the pre-1876 law was applied to permit a child adopted in 1874 to take under a gift by a testator, who died in 1857, to the "child" of the testator's son living at the latter's death, where the son died in 1879, leaving the adopted child him surviving. *Tirrell* v. *Bacon*, 3 Fed. 62 (D. Mass. 1880).

In *Wyeth* v. *Stone*, 144 Mass. 441, 443, Chief Justice Morton pointed out that "[i]t is probable that the" 1876 statute "was passed in consequence of" the decision in *Sewall* v. *Roberts*, 115 Mass. 262. He continued, "The design of Legislature in this [1876] statute clearly was to . . . limit the rights of an adopted child under the previous statute, as construed by this court. The purpose of the statute seems to be to make a distinction between [1] property which the adopting parent owns and can dispose of by will, and [2] other property or rights which a child

---

[5] Statute 1851, c. 324, § 6, provided that an adopted child should be "deemed, for the purposes of inheritance and succession by such child, . . . and all other legal consequences and incidents of the natural relation of parents and children, the same to all intents and purposes as if such child had been born in lawful wedlock of such parents or parent by adoption," with an exception for property "expressly limited to the heirs of the body."

born in wedlock can take derivatively through . . . his parent. Thus . . . an adopted child will take by succession . . . property which the parent owns . . . but he cannot take property not owned by the parent . . .. He can inherit directly from the parent, but he cannot inherit in lieu of his parent by right of representation from any of his parent's kindred."

3. General Laws c. 210, § 8 (and its predecessors), as it (and they) read before the 1958 amendment, was applied with uniformity to prevent a child, adopted by someone not the testator or settlor, from taking as "issue" an interest under a trust instrument. See *Blodgett* v. *Stowell,* 189 Mass. 142, 144; *Gallagher* v. *Sullivan,* 251 Mass. 552, 554–555; *Bundy* v. *United States Trust Co.* 257 Mass. 72, 80; *New England Trust Co.* v. *Sanger,* 337 Mass. 342, 345–346. Such an adopted child could not take as "heir" or "heir-at-law." *Wyeth* v. *Stone,* 144 Mass. 441, 443–444. See *Blodgett* v. *Stowell,* 189 Mass. 142, 144; *Brown* v. *Wright,* 194 Mass. 540, 545; *Walcott* v. *Robinson,* 214 Mass. 172, 176; *Old Colony Trust Co.* v. *Wood,* 321 Mass. 519, 523–524. He could not take as "child." See *Hutchins* v. *Browne,* 253 Mass. 55, 58–59; *Perkins* v. *New England Trust Co.* 344 Mass. 287, 294. In the *Perkins* case, we decided definitely that the 1958 amendment was prospective only, that we should apply it only to instruments executed after its effective date, and that we would follow the earlier cases just cited, even after the enactment of the 1958 amendment, with respect to instruments executed before the effective date of the amendment.

4. It is now argued that *Moore* v. *Cannon,* 347 Mass. 594, 596–599, is inconsistent with the cases just cited. We dealt there with a gift (pp. 595–596) upon a stated condition "to those who would have been entitled to receive such part of my . . . estate had such child [of the testator] died intestate vested with the title thereto." [6]

---

[6] A son and a daughter of the testator had died each leaving two children born in lawful wedlock. Donald, a son of the testator, had died leaving an adopted son. All of the children by blood and Donald's

We held (p. 599) that "the testator in effect has treated, for purposes of distribution, his deceased son Donald's share as if legal title to it had been vested in Donald." We also said (pp. 598–599), "In effect the testator has designated as distributees those persons who would have taken the trust property by intestate succession if Donald himself had owned the property directly." We viewed the language of the will, as matter of interpretation, as requiring that Donald's share pass to his statutory "heirs." The *Moore* case involves no contradiction of our cases under the form of c. 210, § 8, which was in effect from 1876 until 1958.[7]

5. The Flemings now argue that the Massachusetts decisions under G. L. c. 210, § 8, as it read for over eighty-one years from 1876 to 1958, have application only when the contest is between (1) children or issue born in lawful wedlock to the testator or one of his descendants by blood, and (2) adopted children of a descendant of the testator (or of another person named by the testator, in such a manner as to make the adopted child's claim derivative through such other person). The contention is that, when the contest is between (1) such an adopted child and (2) a charity, the adopted child should prevail, absent a clear indication to the contrary in the governing instrument.

A majority of the court are of opinion that this contention cannot prevail. We perceive no words or language in the pre-1958 form of c. 210, § 8, or in the will before us, which justify the contention. The result might be to

---

adopted son were alive at the time of the distribution. See pp. 596–597.

[7] It is contended, on the authority of *Levy* v. *Louisiana*, 391 U. S. 68 and *Glona* v. *American Guar. & Liab. Ins. Co.*, 391 U. S. 73, that c. 210, § 8, as it read prior to 1958, denies the equal protection of the laws to adopted children. The *Levy* and *Glona* cases dealt with illegitimate children and rights of action for wrongful death. *Estate of Jensen*, 162 N. W. 2d (N. D.) 861, 876–878, took a similar view of rights of illegimate children by intestate succession, but see *Labine* v. *Vincent*, 401 U. S. 532. We think these decisions have no application to the interpretation of a will and the legal effect of words used. Cf. Developments in the Law — Equal Protection, 82 Harv. L. Rev. 1065, 1069–1072.

have the same word, e.g. "issue" in the same sentence mean only "issue by blood born in lawful wedlock" in one context, and include adopted children in another context.[8] Such a result seems to us wholly inconsistent with the pre-1958 decisions and with the explicit provision in § 2 of the 1958 statute (see fn. 2, *supra*) that the statute was to apply only to devises or bequests (and certain other gifts, in trust or otherwise, not mentioned to avoid confusion, in the several stages of the statutes as already quoted) after August 26, 1958, the effective date of St. 1958, c. 121 (which, see § 3, was "six months after its passage" or approval on February 26, 1958).

The departure, now proposed, from the logic of our earlier cases would raise various uncertainties concerning such matters, among others, as (a) the effect of such a departure upon distributions (without a court order) heretofore reasonably made to charities (as e.g. under indentures of trust) in similar circumstances, rather than to adopted children (and probably without notice to the latter); (b) the effect upon past and future income and death tax deductions and allowances based upon the existence of a charitable remainder supposedly indefeasible except by the birth of further issue, by blood, of the testator or settlor; (c) the extent to which certain

---

[8] The inconsistency may be brought out sharply by a hypothetical case. Let us suppose the following facts: T's pre-1958 will, executed in 1954, leaves property in trust to pay the net income to T's wife W for her life, then to T's daughter D for her life, and, at the death of the survivor of T, W, and D, to pay the principal among the daughter D's "issue," then living, per stirpes, and in default of such then living "issue" of the daughter D, to pay one-half of the principal to T's then living "issue" per stirpes and one-half to the H charitable hospital. X, the only son of T's deceased son S, survives T, W, S, and D. T dies in 1956. In 1957, D adopts an infant girl A, who survives W and D (and, of course, also T). D, T's daughter, dies in 1960, leaving surviving her no issue by blood but only her adopted daughter A. The testator's wife, W, dies on January 5, 1969 (as did Grace Fleming in the case at bar). The effect of the Fleming contention would be that A (D's adopted daughter) would be treated as one of T's and D's "issue" with respect to the one-half share of the principal for which A competes with the H hospital, but not (applying the rule of our earlier cases) as one of D's "issue" with respect to the half share for which A competes with T's grandson X. This result (in the hypothetical situation) gives different meanings to the same word, "issue," in the same sentence with respect to each of two remainder gifts.

adoptions (particularly those by, and those of, older persons) [9] would have the effect of making the adopted persons statutory "issue" under pre-1958 wills or other instruments of persons other than the adopting parents; and (d) the extent to which the opinion may affect situations not even mentioned in any one of the numerous supplemental briefs or now imagined by us. Some of these may involve Federal tax consequences beyond this court's control.

All of us recognize that there is a natural desire to give effect to the humanitarian legislative policy of St. 1958, c. 121, § 1 (which we assume, without deciding, may be controlling at least for instruments executed after the effective date of the 1958 statute); and to treat, as far as possible, on the same basis as children by blood, persons adopted as young children (in ordinary course) by parents of normal age for raising families. Such probably is the trend of recent legislative policy and public viewpoint, although it may be the consequence of a considerable change in public attitudes since 1899 when the will before us was drawn. [10]

We cannot join, however, in what seems to us a retroactive promulgation of a new and unexpected rule which has the effect (a) of taking established interests in prop-

[9] What will be the effect, for example, of adoption of persons no longer minors, or of minors over fourteen, or of adoptions by persons older than those who normally are the parents of children by blood? Will a different rule be applied for older persons who adopt orphaned relatives? It may be assumed, of course, that few adoptions will take place solely in order to secure particular property about to pass under an existing document. Ordinarily, other much more important motives, wholly commendable, will lead to adoptions which usually may be regarded as acts having wholly independent significance (and substantial, independent consequences) unrelated to property dispositions. See analogy of *Second Bank-State St. Trust Co.* v. *Pinion*, 341 Mass. 366, 369 (where, however, the later act of independent significance was that of the testator).

[10] The present litigation, the uncertainties about conflicts of law problems concerning instruments, and the authorities mentioned in Part 6 of this opinion all demonstrate that in the future draftsmen will be prudent to indicate clearly whether adopted children are to be included in (or excluded from) class gifts to "children," "issue," "descendants," and the like, and (if they are to be included) which types of adopted children (e.g. those adopted while minors) are so to be included).

erty from their charitable owners and bestowing those interests upon adopted children of a person other than the testator and (b) of threatening unpredictable consequences in hitherto well established property law matters. As Chief Justice Qua said of a somewhat comparable well settled principle of legal construction in *Fiduciary Trust Co.* v. *Mishou*, 321 Mass. 615, 636, "If this [existing] rule of construction is deemed too harsh, the remedy is not to be found in sudden and unheralded changes by judicial decision in the meanings of words which have long been established and accepted and in reliance upon which wills have been drafted and settlements of property effected."

6. Various decisions elsewhere, reaching a contrary result, have been brought to our attention. These in part rest upon much less explicit statutory provisions than those found in our pre-1958 statute, together, in some instances, with a more general interpretation of terms like "issue" than we have felt free to adopt in our earlier decisions construing pre-1958 instruments. Cases dealing with competition between adopted children and charities include *Estate of Stanford*, 49 Cal. 2d 120, 135–142; *Estate of Heard*, 49 Cal. 2d 514, 518–523, in which great emphasis was placed upon what the California court regarded as that State's "public policy" of treating adopted children as "issue" or "children." Cf. *Melek* v. *Curators of Univ. of Mo.* 213 Mo. App. 572, 574–577 (but see *St. Louis Union Trust Co.* v. *Greenough*, 282 S. W. 2d 474, 482–483 [Mo.]). Decisions holding on a more general basis that adopted children may take as beneficiaries of testamentary gifts are *Johns* v. *Cobb*, 402 F. 2d 636, 637–638, fn. 5 (D. C. Cir.), cert. den. 393 U. S. 1087; *Estate of Coe*, 42 N. J. 485, 490–495; and *In re Thompson*, 53 N. J. 276, 280–300; *Chase-Manhattan Bank* v. *Mitchell*, 53 N. J. 415, 417–418; *Matter of Park*, 15 N. Y. 2d 413, 416–419 (resting on a statute construed as being substantially broader and more flexible than the pre-1958 form of c. 210, § 8, by a bare majority of the New York court over a strong dissent, pp. 419–

421); *Matter of Silberman*, 23 N. Y. 2d 98, 104–109; Halbach, Rights of Adopted Children Under Class Gifts, 50 Iowa L. Rev. 971. Compare Restatement: Property, § 265, comment d; § 287, § 292; Am. Law of Property, § 22.34; Oler, Construction of Private Instruments Where Adopted Children are Concerned, 43 Mich. L. Rev. 705, 729, 735, 901, 931; Kales, Rights of Adopted Children, 9 Ill. L. Rev. 149, 164–166; Casner, Estate Planning (3d ed. and 1970 supp.) 487 (and reference to that page in the 1970 supp.). We adhere to our prior construction of our clearly expressed pre-1958 statute and decline to follow contrary decisions with respect to the 1899 will now before us.

7. The decree of the Probate Court is affirmed. Costs and expenses (including counsel fees) are to be in the discretion of the Probate Court.

*So ordered.*

BRAUCHER, J. (dissenting, with whom TAURO, C.J., and SPIEGEL, J., join) I dissent from the decision of the court and from points 5 and 6 of the opinion.

The testator at age sixty-eight left his property to the unknown "issue" of his unmarried daughter. If there were no "issue," it was to go in equal shares to six named charities. So far as appears, he had never heard of any of the charities until the person who drew his will suggested them as reputable organizations. After his death his daughter married but had no children. When she was about forty, she and her husband adopted two children age one and six and reared the children in their household. Now the court holds that the testator left the property to the charities to the exclusion of his adoptive grandchildren.

Commendably, the court avoids making any suggestion that it is carrying out the probable intention of the testator. Such a suggestion would outrage common sense and natural human feeling. The court suggests that there may have been "a considerable change in public

attitudes since 1899"; it does not and could not properly suggest that people in 1901 did not have natural human feelings like those we now have. Instead, the result is attributed to the "words or language in the pre-1958 form" of the statute,[1] to "the logic of our earlier cases," and to "the explicit provision" of the 1958 statute limiting it to instruments executed in the future. Thus it is made to appear that the villain of the piece, who did not "give effect to the humanitarian legislative policy" of 1958 and 1969, is not the court.

The statute in question is Pub. Sts. c. 148, § 8, derived from St. 1876, c. 213, § 9. That statute embodied an intelligible and defensible policy that, unless a contrary intention plainly appeared, "blood" relatives of a testator should take under words like "child" to the exclusion of children adopted by anyone but the testator himself. Incidentally, the statute eliminated claims by "children" adopted when they were forty years old, and avoided strange contentions based on hypothetical adoptions by infertile octogenarians. See Whitmore, The Law of Adoption in the United States and Especially in Massachusetts (1876), preface at v, 74, 77, 78n. There is not the slightest indication that anyone considered in 1876 the possibility of a contest between adopted children and charities claiming a gift in default of issue.

As applied to a contest between a charity and the usual adopted child, no one really suggests that the statute makes any sense at all. If someone had suggested such a case to the Legislature in 1876, any legislator would have been entitled to say, "But of course we don't mean that." Lawyers might have said that unless an exception was inserted some judge might be perversely literal. Lay legislators would then have shaken their heads at the

---

[1] The linguistic demonstration in the court's fn. 8 is unconvincing. Statute 1876, c. 213, § 9, clearly recognized that "issue" sometimes included adopted children and sometimes did not. In a single gift to "issue" of a testator, per stirpes, the statute said that, in the absence of a contrary intention, a child adopted by the testator is his "issue," but that an adopted grandchild is not, whether or not the adoptive parent was himself adopted.

tendency of lawyers to distort language and make every-
thing too complicated to understand.

The same rule was adopted in other States, usually
without such explicit statutory guidance. Numerous de-
cisions in this State and elsewhere have applied the rule.
All of our decisions, most of those elsewhere, and most of
the learned commentaries on the subject have dealt with
contests between adopted children and relatives by
"blood." None of our decisions has involved a contest
between charities and adopted children. Counsel asserted
to us in argument that they had found no case in which
adopted children were unsuccessful in such a contest.[2]
Adopted children prevailed against a university and a
fraternal organization in *Estate of Stanford,* 49 Cal. 2d
120, and *Estate of Heard,* 49 Cal. 2d 514.

Before 1958 there were no "pre-1958 decisions" in this
court governing a contest between charities and adopted
children. At the very least, the question now presented
was fairly open. Beginning in 1958, the Legislature has
twice repudiated the entire pre-1958 policy. This court
decided that the 1958 statute, expressly prospective,
should not be applied retroactively. *Perkins* v. *New Eng-
land Trust Co.* 344 Mass. 287, 294. But the present
decision is entirely out of harmony with *Moore* v. *Cannon,*
347 Mass. 594, 596–597, 599. There the gift was made
by unprecedented language designating the statutory
"heirs" of the adoptive parent. In the face of numerous
decisions that adopted children were not "heirs," we said
we had been referred to "no Massachusetts case which
deals with precisely this question." We declined to "ex-
tend" the prior decisions to the new situation, since the
statute reflected no continuing public policy. That was
in a case where the contest was between "blood" relatives
and an adopted child, where the intention imputed to the

---

[2] *Melek* v. *Curators of Univ. of Mo.* 213 Mo. App. 572 (gift to "chil-
dren" of testator's daughter did not include her adopted child), seems
to be such a case. But compare *St. Louis Union Trust Co.* v. *Greenough,*
282 S. W. 2d 474, 482–483 (Mo.) (contrary result where gift is to
"grandchild" or "descendant").

testator by the statute, to exclude the adopted children, may once have been natural, normal and probable. Thus we refused to "extend" the statute to a situation squarely within the legislative language and purpose and within any purposive reading of our precedents. Now we "extend" the same statute to a case within no such purpose and no such precedent. By perverse literalism, we are breathing new life into a fossil statute and making it grow.

One is tempted to say that in this case, "It plainly appears to have been the intention of the . . . testator to include an adopted child," within the meaning of the governing statute. See St. 1876, c. 213, § 9. Such a reading would do no more violence to the statute than the perverse literalism of the court. But I agree with the court that humanitarian impulses and even common sense do not justify us in distortion of language. Realistically, neither the Legislature nor the testator had any intention at all with respect to the question facing us in this case. Compare *Sewall* v. *Roberts,* 115 Mass. 262, 278. See Kales, Rights of Adopted Children, 9 Ill. L. Rev. 149, 159–160; Oler, Construction of Private Instruments Where Adopted Children Are Concerned, 43 Mich. L. Rev. 705, 708–709. It is hard to believe that the person who drew the will, if he was a lawyer, would have deliberately selected the word "issue" to execute his client's purpose to exclude an adopted child, especially since the words of the pre-1958 statute left open the possibility that a testator's intention to include an adopted child might "plainly" appear from evidence outside the will. See *Chase Manhattan Bank* v. *Mitchell,* 53 N. J. 415, 418. Indeed, a widely used lawyers' book, Crocker's Notes on Common Forms, carried forward unchanged in the fourth edition (p. 458), published in 1902, the following passage from the third edition (p. 423), published in 1883: "It seems that under a devise to the 'heirs' or to the 'children' of A., a child adopted by A. under . . . [cited statutes] would take. See Sewall *v.* Roberts, 115 Mass. 262, 276."

Something must be said about the "various uncertain-

ties" which, according to the court's opinion, might be raised by "departure . . . from the logic of our earlier cases":

(a) *Past distributions.* It is suggested that there may have been distributions to charities in similar circumstances, without a court order and without notice to adopted children. In all probability, no such distribution has ever been made in reliance on our decisions. Only one comparable reported case in Massachusetts has been found in which a trustee had made a distribution without court order, *Old Colony Trust Co.* v. *Wood,* 321 Mass. 519. The property had been delivered to the adopted child shortly after the death of a life beneficiary in 1945, and suit to recover it was brought the same year. Most of the cases, notwithstanding the supposed certainty established by our prior decisions, have arisen on petitions for instructions or for declaratory relief. It seems safe to predict that after the present decision careful trustees will continue to seek the protection of court orders.

The horrible example has arisen in New Jersey. *In re Thompson,* 53 N. J. 276. There income had been paid to a "blood" child of the testator's daughter for about eighteen years, to the exclusion of her adopted child. When the court held, contrary to its prior decisions, that "issue" included the adopted child, it said (p. 299), "the adopted child properly does not assert a right to have the natural child account for moneys already received, or to surcharge the trustees for payments made. His claim is limited to what is undistributed." No such problem is presented in the present case, and I think it undesirable to decide this case unjustly for fear that we might later have to decide a different case differently in order to decide it justly.

(b) *Tax deductions.* We should not skew our law of property to save our citizens from paying what they owe by way of taxes. This case does not involve the hypothetical adoption of a child by an infertile octogenarian, destroying the deductibility of a charitable remainder. See *Hamilton Natl. Bank* v. *United States,* 236 F. Supp.

1005, 1016–1017 (E. D. Tenn.), affd. 367 F. 2d 554 (6th Cir.). For reasons indicated below, a decision for the adopted children in this case should be limited to like cases, where children are adopted at a tender age by the life beneficiary, the adoptive parent is of normal age for raising a family, and the child is reared in her household. Counsel for the adopted children here have convincingly demonstrated that a decision so limited would frustrate reasonable expectations of tax advantages only in a case where the life beneficiary had submitted to sterilization. Even if the decision were not so limited, because of the combined effect of statutes of limitations and changes in the tax laws, the tax impact would apparently be minimal except on a 1968 tax year.

(c) *Abnormal adoptions.* This case does not present the problems of adoption by an aged person, adoption at the deathbed of the adoptive parent, or adoption of an adult. These problems, unlike that in the case at hand, were discussed at the time the 1876 statute was enacted. See Whitmore, The Law of Adoption in the United States and Especially in Massachusetts (1876) 74, 77, 78n. They have arisen. See *Wyeth* v. *Stone,* 144 Mass. 441 (adoption of widower of adoptive parent's daughter); *Old Colony Trust Co.* v. *Wood,* 321 Mass. 519 (adoption of forty year old woman); Halbach, Rights of Adopted Children Under Class Gifts, 50 Iowa L. Rev. 971, 988–989, 994–995; Oler, Construction of Private Instruments Where Adopted Children Are Concerned, 43 Mich L. Rev. 901, 923–926. We should deal with them in a sensible way. The perverse literalism of the present decision must not be carried over to such cases arising under wills drawn after 1958, and no one should rely on the present decision by adopting his grandmother in order to enable her to take as his "issue" under a post-1958 will. Counsel inform us, however, that the overwhelming majority of adoptions involve children under six, and there are almost none involving children over twelve. We should not deal unjustly with the thousands to avoid having to distinguish the one who is different.

(d) *Unimagined cases.* The court seems to think that what we say today in a known case might somehow control our decision unjustly or create new uncertainty in a case which is so different that no one has thought of it. If this is so, which seems doubtful, the risk seems to exist whichever way we decide.

Hopefully the present decision is an example of the excessive devotion of lawyers and judges to their own linguistic prejudices rather than what is sometimes called retributive statutory interpretation. Otherwise, the court is saying to the Legislature, "We see what you meant, but you said more than that, and we must therefore carry out your unjust and irrational command in order to teach you to speak more clearly." Either way the penalty falls on litigants born some forty years after the legislation, and it is imposed at a time when the legislators responsible are long since dead and the entire legislative policy has been abandoned.

The linguistic problem is not new, nor is it limited to the law; it is inherent in the use of language to direct conduct: "Someone says to me: 'Shew the children a game.' I teach them gaming with dice, and the other says 'I didn't mean that sort of game.' Must the exclusion of the game with dice have come before his mind when he gave me the order?" Wittgenstein, Philosophical Investigations (3d ed. 1969), 33e. "The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law which enacted, 'that whoever drew blood in the streets should be punished with the utmost severity,' did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit." *United States* v. *Kirby,* 7 Wall. 482, 487. Bentham might have approved the present decision, if there were a procedure by which it could be reported to the Legislature with a view to retroactive curative legislation; otherwise, he said, "Human reason does not seem to be yet far enough advanced to warrant our laying the discretionary mode of interpretation under an absolute prohibition in all cases whatsoever." See Bentham, Of Laws in General

(Hart ed. 1970) 161, 241.  As applied to statutory language, Humpty Dumpty's dictum overstates the case: "When *I* use a word, . . . it means just what I choose it to mean — neither more nor less."  His second thought was better: "The question is, . . . which is to be master — that's all."  Carroll, Through the Looking-Glass (Gardner anno. ed. 1960) 269.

This court has a long and proud history of sympathetic treatment of legislation, of reading statutes in the light of their purposes, of attributing to the Legislature an intelligent and intelligible policy, of fitting new statutes into the existing framework of statutes and common law, in an effort to make a coherent whole.  We should not depart from that tradition now.  Since the present case is unprecedented, interstitial judicial legislation is unavoidable, however we decide.  But a decision not based in any traditional understanding or legislative policy, or indeed in any rational and coherent purpose is unwarranted judicial legislation.

Finally, it seems to me particularly unfortunate that this decision reverses the unanimous decision of a quorum of five members of this court.  See the court's fn. 1. This case does not involve any problem of past distributions made in reliance on our decisions, of reopening past tax returns, or of the imposition of unexpected tax liabilities.  Neither the briefs nor the original opinion mentioned such problems, and they were called to our attention in requests for rehearing.  As is indicated above, they are avoided if the decision is properly limited to the facts before us.  They do not justify the substitution of an incorrect decision for a correct one, or the casting in doubt of the finality of all our decisions.