# H. BURTON POWERS, trustee, *vs.* MARGARET K. WILKINSON & others.[1]

Suffolk. October 8, 1986. — April 16, 1987.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Illegitimate Child. Devise and Legacy,* Illegitimate child, Issue. *Constitutional Law,* Equal protection of laws, State action. *Retroactivity of Judicial Holding. Words,* "Issue."

In construing the donor's intent where a trust instrument itself contained no indication whether the donor intended by her use of the word "issue" to include or exclude descendants born out of wedlock (nonmarital descendants) and where a nonmarital great-grandchild was born after the donor's death, this court held that the donor intended, in accordance with the law extant at the time the instrument was executed, to exclude nonmarital descendants from the class denoted by her use of the word "issue." [653-654]

State action is not involved, nor is the equal protection clause of the Fourteenth Amendment to the Constitution of the United States implicated, by the application of a common law rule of construction to interpret the word "issue" to mean "only persons of the class who were born in lawful wedlock"; therefore no constitutional rights of a person thereby excluded from a class of beneficiaries of a trust would be violated by this court's so doing. [654-656]

The traditional rule, as stated in *Fiduciary Trust Co.* v. *Mishou,* 321 Mass. 615 (1947), excluding nonmarital children from judicial construction of the word "issue" was abolished, as the archaic attitudes underlying the rule can no longer be imputed to donors and testators who use the word "issue" without explication; absent clear expressions of a contrary intent, the word "issue" must henceforth be construed to include all biological descendants, regardless of the marital status of the parents. [657-662]

A newly-announced rule of construction defining "issue" to include all biological descendants regardless of the marital status of the parents,

[1] Polly Patscheck, Lucy Patscheck (minor), Bruce R. Kent, Polly K. Campion, Kieren J. Campion (minor), Ashley K. Campion (minor), Timothy R. Kent, Nicholas Kent, Janet T. Ancell, Andrew Ancell (minor), Aaron Ancell (minor), Olivia Gay, Susan Tarshis, Julie Elizabeth Tarshis (minor), Andrew Tarshis, and Rosamond K. Sprague.

invalidating a long established controlling precedent on which litigants, the bar, and others have been entitled reasonably to rely, was to be applied only to trust instruments executed after the date of this opinion. [662-663] ABRAMS, J., with whom HENNESSEY, C.J., and NOLAN, J., join, dissenting.

CIVIL ACTION commenced in the Suffolk Division of the Probate and Family Court Department on July 12, 1985.

The case was heard by *Mary C. Fitzpatrick, J.,* on a statement of agreed facts and was reported by her to the Appeals Court. The Supreme Judicial Court granted a request for direct review.

*H. Burton Powers (Gerald B. O'Grady, III,* with him) for the plaintiff.

*Paul B. Sargent,* guardian ad litem for the minor defendants and persons unborn or unascertained.

LIACOS, J. The trustee of an inter vivos trust brought this action in the Probate and Family Court Department for Suffolk County, seeking a declaratory judgment that a child born out of wedlock to the donor's granddaughter is "issue" of the donor's children for purposes of the trust. The nonmarital child remains illegitimate because her paternity has never been acknowledged and her parents have never intermarried.[2]

The parties named as defendants include all the living beneficiaries of the trust. None has answered, although all have been served with notice. A guardian ad litem (guardian) was appointed to represent the interests of the donor's minor issue, and he has opposed the relief prayed for by the trustee. A guardian ad litem also was appointed to represent the nonmarital child; he has adopted the arguments advanced by the trustee. The parties signed a statement of agreed facts, and the Probate Court judge granted their joint motion pursuant to Mass. R. Civ. P. 64, 365 Mass. 831 (1974), for reservation and report of the case to the Appeals Court. We granted direct appellate review.

---

[2] The statute governing legitimacy in this Commonwealth is G. L. c. 190, §7 (1984 ed.), which reads in relevant part: "An illegitimate person whose parents have intermarried and whose father has acknowledged him as his child or has been adjudged his father under chapter two hundred and seventy-three shall be deemed legitimate . . . ."

The facts agreed are these. On May 7, 1959, the donor established an inter vivos trust that, by its terms, was to be construed according to the laws of the Commonwealth. The trust instrument provided for payment of income to the donor for life, then to her surviving children in equal shares for the duration of their lives, and then to the children's "issue" by right of representation. The indenture of trust also authorized the trustee "to pay to or for the benefit of the children of the Donor and their issue such amounts of principal as the Trustee . . . may deem necessary for comfort, maintenance, support and education without reduction of the interest of the recipient in income and principal." The trust is to terminate twenty-one years after the death of the donor's last surviving child, whereupon the trustees are to convey the share of each of the donor's children to that child's issue by right of representation, notwithstanding prior unequal distributions of principal.

The donor died on August 5, 1969. She was survived by one son and two daughters, one of whom still survives, and nine grandchildren, all of whom survive.[3] On July 14, 1973, a unmarried granddaughter of the donor gave birth to a daughter (nonmarital child). The nonmarital child has never been the subject of legitimation, paternity, or adoption proceedings. She has resided with her mother in Vermont, in close proximity to her maternal relatives, who have accepted her as a member of their family circle.

Distributions of principal to the nonmarital child are sought to provide for her support and education. Such distributions were made in the past on joint requests from the child's mother and grandmother, the trustees then being unaware of the child's nonmarital status.[4] It is undisputed that the nonmarital child is illegitimate, both by the law of this Commonwealth and by the law of Vermont, the State of her birth and the only domicil she has known.

The trustee advances several alternative arguments in support of the declaration he seeks.[5] We discuss each in turn.

---

[3] The statement of agreed facts was filed on October 9, 1985. The status of the trust's beneficiaries as "surviving" or "deceased" was current as of that date.

[4] The grandmother of the nonmarital child died on March 26, 1985. At that time, the child's mother succeeded (together with each of her siblings) to a one-twelfth share of the income from the trust.

[5] The trustee raised several of these arguments in an earlier case involving other parties, but we reach these questions for the first time. See *Powers* v. *Steele,* 394 Mass. 306, 309 n.5 (1985).

1. *The donor's intent.* "It is fundamental that a trust instrument must be construed to give effect to the intention of the donor as ascertained from the language of the whole instrument considered in the light of circumstances known to the donor at the time of its execution." *Groden* v. *Kelley,* 382 Mass. 333, 335 (1981), relying on *Dana* v. *Gring,* 374 Mass. 109, 117 (1977), and cases cited. Our review of the trust instrument confirms what is undisputed here, that the instrument itself contains no indication of the donor's intent to use the word "issue" so as to include or exclude nonmarital descendants. Additionally, assuming that evidence of external family circumstances would be competent, we note that the existence of the nonmarital child was not known to the donor at the time she executed the instrument, the child having been born after the donor's death.

In these circumstances, the trustee argues that, absent extrinsic evidence establishing that the donor ascribed a special meaning to the term "issue," her intent "must have been to use [it] in its usual and customary meaning as generally used, meaning biological issue, regardless of legitimacy, 'progeny' or 'offspring,'" citing Webster's New Int'l Dictionary (2d ed. 1947). While we take judicial notice that the dictionary meaning of "issue" does not exclude nonmarital children, and it did not at the time the donor executed her indenture of trust, we know of no legal authority for the proposition that contemporaneous dictionary meanings must be read into the ambiguous words of trust instruments. Additionally, the statutory law of this Commonwealth is not wholly consistent with the dictionary definition of "issue" which the trustee urges upon us. General Laws c. 4, § 7, Sixteenth (1984 ed.), provides: "'Issue', as applied to the descent of estates, shall include all the lawful lineal descendants of the ancestor."[6] The common law rule is squarely contrary to the trustee's position. We have stated that "[t]he word issue . . . must be interpreted against a background

---

[6] The trustee argues that G. L. c. 190, § 5 (1984 ed.), must be construed to create equal status for persons born out of wedlock where, as here, the nonmarital child claims through a female beneficiary. In pertinent part, § 5 reads as follows: "An illegitimate person is heir of his mother and of any person from whom his mother might have inherited, if living . . . ." It is undisputed that the trust at issue here involves a gift, not an inheritance. The nonmarital child is not her mother's heir until the mother's death. *First Agricultural Nat'l Bank* v. *Shea,* 351 Mass. 1, 3 (1966). A similar argument was rejected in *Fiduciary Trust Co.* v. *Mishou, supra* at 635-636; thus, we cannot conclude that § 5 applies to the question at bar.

of statutory phraseology and construction which has remained wholly consistent for well over a century." *Fiduciary Trust Co.* v. *Mishou,* 321 Mass. 615, 635 (1947). Dealing with the question whether an illegitimate child was included within the expression, "the issue of my deceased children," we stated further: "We can hardly regard this as an open question in this Commonwealth. It cannot be doubted that by the common law of a few generations ago such words as issue, children, descendants, and so forth as descriptive of a class in a grant, devise, or legacy, in the absence of anything indicating a contrary intent, meant only persons of the class who were born in lawful wedlock." *Id.* at 634. This rule of construction was operative at the time the trust in question was executed, and it concludes the question of the donor's intent. Because nothing indicates an intent by the donor to include nonmarital issue, precedent requires us to presume that the donor intended, in accordance with the law extant at the time the instrument was executed, to exclude nonmarital descendants from the class denoted by her use of the word "issue."

2. *Equal protection analysis.* The trustee argues that application of the rule of construction stated in *Mishou, supra,* would violate the rights of the nonmarital child to equal protection of the laws as guaranteed by the Fourteenth Amendment to the Constitution of the United States.[7] We disagree.

It is the trustee's contention that the rule of construction as to a donor's intent discriminates against nonmarital children because, taken in tandem with G. L. c. 190, § 7 (1984 ed.) (see note 2, *supra*), it impermissibly excludes from trust participation as "issue" all nonmarital children not expressly included unless their parents have intermarried. We do not view this argument as persuasive. The guarantees of the equal protection clause of the Fourteenth Amendment are directed solely to limiting the actions of government. See *Commonwealth* v. *Hood,* 389 Mass. 581, 584-586 (1983), and cases cited.

---

[7] In relevant part, the Fourteenth Amendment reads as follows: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."

The trustee argues, nevertheless, that the rule of construction set forth in *Mishou, supra,* is subject to scrutiny under the Fourteenth Amendment because the United States Supreme Court has said that "State action . . . refers to exertions of [S]tate power in all forms." *Shelley* v. *Kraemer,* 334 U.S. 1, 20 (1948). We do not believe that the holding in *Shelley* is relevant here. "In *Shelley,* neighboring property owners sought to enforce a private, racially restrictive agreement to prevent the sale of a house by a white seller to a black purchaser. The Court held that judicial enforcement of the agreement constituted State action." *Hood, supra* at 588. However, "[t]he Supreme Court has not developed *Shelley* beyond these facts . . . ." *Id.*

*Shelley* is inapposite on its facts. In *Shelley,* the Court had no doubt that State action was involved because it was clear that "but for the active intervention of the state courts, supported by the full panoply of state power, [the black] petitioners would have been free to occupy the properties in question without restraint." *Shelley, supra* at 19. State action was found because judicial enforcement of the "private law" of restrictive covenants effectively barred blacks from participation in a significant segment of the housing market. In *Mishou,* the court reaffirmed a definition for a word whose meaning, as judicial experience repeatedly showed, would remain ambiguous without judicial clarification. Under the court's ruling, donors and testators enjoyed freedom to use the word "issue" without explication, confident that we would enforce the instrument containing it to exclude nonmarital children. Similarly, donors have been free to modify the word by stating an additional, contrary intent, in which case we have enforced the instrument to honor that intent. When "issue" is used in a legal instrument, with or without explication, it is the donors and testators who act, not this court nor any other arm of the State.[8] Thus, we hold

---

[8] But see *Estate of Dulles,* 494 Pa. 180, 190 (1981) (statutory rule of will construction amounts to State action in manner identical to an intestacy statute because in both instances the State steps in to supply a presumed intent, with the result that "the state and not the decedent dictates the method of distribution"). Cf. *Trimble* v. *Gordon,* 430 U.S. 762, 774 (1977).

that State action is not involved, nor is the equal protection clause of the Fourteenth Amendment implicated, when courts apply rules of construction to wills or trust instruments. Accord *Hanson* v. *Markham,* 371 Mass. 262, 265 (1976); *Boston Safe Deposit & Trust Co.* v. *Fleming,* 361 Mass. 172, 179 n.7 (1972).[9] Therefore, no constitutional rights would be violated if the rule stated in *Mishou* were to be applied in this case.[10]

---

[9] We note that the trustee's equal protection argument relies primarily on *Trimble* v. *Gordon, supra,* which invalidated an intestacy statute, not a judicially created rule. While we do not deny that rules applying to what has traditionally been thought of as the area of "private law" may trench upon equal protection concerns, it is instructive to note that no decision by the Supreme Court of the United States ever has invalidated a common law rule of construction on the ground that it violated the equal protection clause by discriminating impermissibly against nonmarital children. The liberalizing decisions handed down by the Supreme Court in recent years have all been directed at statutory discriminations. See *Reed* v. *Campbell,* 476 U.S. 852 (1986) (intestacy statute); *Pickett* v. *Brown,* 462 U.S. 1 (1983) (statute of limitations on paternity suits); *Mills* v. *Habluetzel,* 456 U.S. 91 (1982) (same); *United States* v. *Clark,* 445 U.S. 23 (1980) (Civil Service Retirement Act); *Lalli* v. *Lalli,* 439 U.S. 259 (1978) (intestacy statute); *Trimble* v. *Gordon, supra* (same); *Mathews* v. *Lucas,* 427 U.S. 495 (1976) (Social Security Act); *Jimenez* v. *Weinberger,* 417 U.S. 628 (1974) (same); *New Jersey Welfare Rights Org.* v. *Cahill,* 411 U.S. 619 (1973) (State statute providing assistance to families of the working poor); *Gomez* v. *Perez,* 409 U.S. 535 (1973) (paternal support statute); *Weber* v. *Aetna Casualty & Sur. Co.,* 406 U.S. 164 (1972) (Workmen's Compensation Act); *Labine* v. *Vincent,* 401 U.S. 532 (1971) (intestacy statute); *Glona* v. *American Guarantee & Liab. Ins. Co.,* 391 U.S. 73 (1968) (wrongful death statute); *Levy* v. *Louisiana,* 391 U.S. 68 (1968) (same); *Beaty* v. *Weinberger,* 478 F.2d 300 (5th Cir. 1973), aff'd, 418 U.S. 901 (1974) (Social Security Act); *Griffin* v. *Richardson,* 346 F. Supp. 1226 (D. Md.), aff'd, 409 U.S. 1069 (1972) (same); *Davis* v. *Richardson,* 342 F. Supp. 588 (D. Conn.), aff'd, 409 U.S. 1069 (1972) (same).

[10] The trustee concedes that the Equal Rights Amendment to the Constitution of the Commonwealth does not apply to this case. See note 11, *infra.* Nonetheless, he claims that "[t]he common law disabilities of birth outside of wedlock require mitigation under Art. 1 of the Constitution of the Commonwealth," due to its provision that all people "are born free and equal and have certain natural, essential and unalienable rights; among which may be reckoned the right . . . of acquiring, possessing and protecting property . . . ." It is not clear from the trustee's brief, however, whether he asserts that art. 1 is applicable in the absence of State action. No authority is cited in support of that proposition. Compare *Batchelder* v. *Allied Stores Int'l, Inc.,* 388 Mass. 83 (1983) (art. 9 of the Massachusetts Declaration of

3. *Obsolescence of the rule of construction.* The trustee argues that the *Mishou* rule should not be applied because it is no longer appropriate to do so in light of current social mores and modern legal developments.[11]

The *Mishou* decision was handed down almost forty years ago. In the interim, this court does not appear to have reconsidered the utility or propriety of its rule that, absent clear expressions of a contrary intent, the term "issue" must be read to exclude nonmarital descendants. Indeed, the *Mishou* court itself did not state the principles underlying this rule of construction; rather, it merely treated the applicability of the rule as a closed question in this jurisdiction. *Mishou, supra* at 634. Nor was the rationale for the rule subjected to judicial scrutiny in any of the decisions relied upon in *Mishou.* See *Mishou, supra* at 634-635, citing *Green* v. *Kelley,* 228 Mass. 602, 606 (1917); *Sanford* v. *Marsh,* 180 Mass. 210, 211 (1902); *Hayden* v. *Barrett,* 172 Mass. 472, 474 (1899); *Adams* v. *Adams,* 154 Mass. 290, 292 (1891).

All these decisions treat the rule as sound because it was well settled in English and American law. We must turn to a

---

Rights is not by its terms directed only against governmental action), with *Commonwealth* v. *Aves,* 18 Pick. 193, 209-210 (1836) (Shaw, C.J.) (if slavery was not effectively abolished in the Commonwealth by colonial law, it was abolished by enactment of art. 1). In this state of underdevelopment, the argument is not one we would be prudent to reach. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975).

[11] The trustee argues that reversal of the *Mishou* rule is required by our holding in *Lowell* v. *Kowalski,* 380 Mass. 663 (1980). In that decision, G. L. c. 190, § 7, as amended through St. 1943, c. 72, § 1, was held to be unconstitutional under the Commonwealth's Equal Rights Amendment, art. 106 of the Amendments to the Massachusetts Constitution, to the extent that § 7 required, as to heirs of the father, parental intermarriage (in addition to paternal acknowledgment or an adjudication of paternity) as a prerequisite to legitimation for purposes of intestate succession. Cf. G. L. c. 190, § 5 (right of illegitimate child to inherit from mother's estate). The trustee concedes that the Equal Rights Amendment does not apply by its terms to nonmarital children. See art. 106 (suspect classifications are only those of "sex, race, color, creed or national origin"). Here we deal not with statutory construction, but with the interpretation of the intent of a donor. We do not see the relevance of *Lowell* to the question at bar, which we decide solely on the basis of our traditional authority to alter or enforce common law rules pertaining to private acts.

decision written in 1827 for what appears to be the most recent judicial airing of the reasons for the rule:

> "[T]here seems to be no maxim of [the common] law less questionable than that a bastard is *filius nullius* . . . . No doubt the law [barring illegitimates from inheriting as next of kin] was so established on higher principles than the interest of individuals. It was to render odious illicit commerce between the sexes, and to stamp disgrace on the fruits of it; and though the punishment usually falls upon the innocent, yet it was thought wise to prohibit them from tracing their birth to a source which is deemed criminal by law and by religion. It is enough that . . . the authors of this misfortune have the power to repair it by will or by gift; the law will not interpose." *Cooley* v. *Dewey,* 4 Pick. 93, 94 (1827) (Parker, C.J.).

It is questionable whether the attitudes expressed by Chief Justice Parker were representative even of his own era; within two years after *Cooley,* the Legislature had mitigated the nonmarital child's status as filius nullius by enacting a statute which made such children heirs of their mothers for purposes of intestate succession. See St. 1828, c. 139, codified at G. L. c. 190, § 5 (legislating, as well, a result contrary to the primary holding in *Cooley, supra*); *Monson* v. *Palmer,* 8 Allen 551, 554-555 (1864).

Moreover, while the "source" of nonmarital birth is still deemed criminal in this Commonwealth, see G. L. c. 272, § 14 (1984 ed.) (adultery), and § 18 (1984 ed.) (fornication), "[i]t seems beyond dispute that the statutes defining or punishing [these] crimes . . . have fallen into a very comprehensive desuetude." *Fort* v. *Fort,* 12 Mass. App. Ct. 411, 417 (1981). But see *Commonwealth* v. *Stowell,* 389 Mass. 171 (1983) (upholding constitutionality of G. L. c. 272, § 14). In this context, we question the practicality of trying to enforce morality or to preserve traditional family values by rules of con-

struction embedded in the law of trusts. Indeed, the quixotic nature of any such attempt is suggested by the facts that, while the *Mishou* rule has been in effect, the nationwide number of nonmarital births yearly had risen to 715,200 by 1982, and the rate of such births had more than tripled since 1960. United States Department of Commerce, Statistical Abstract of the United States 62 (106th ed. 1986).

The justice of punishing innocent children for the actions of their parents has long been questioned. Indeed, doubt was expressed in several decisions relied on by the court in *Mishou*. "Removal of the obstacles to the legitimation of innocent children, who have no responsibility for the circumstances of their birth, and thus ameliorating some of the apparent harshness of the common law, has been the progressive policy of our law as illustrated by statutes and decisions." *Green, supra* at 605. See *Gritta's Case*, 236 Mass. 204, 207 (1920) (holding nonmarital offspring not "children" within the meaning of the Workmen's Compensation Act, but "dependents" where they were members of an employee's family). Acceptance of the idea that justice requires nonpunitive treatment of nonmarital children is reflected in numerous Federal statutes that, over the years before and since *Mishou,* have guaranteed more nearly equal treatment.[12] Similarly, although not controlling here,

---

[12] A representative list of such statutes was compiled in *Matter of Hoffman,* 53 A.D.2d 55, 62-63 n.7 (N.Y. 1976):

| "Statute | Purpose | Effective Date |
|---|---|---|
| US Code, tit 33, § 902, subd(14) | Longshoremen's and Harbor Workers' Compensation Act. Defines a child as including an acknowledged illegitimate child dependent upon the deceased | 1927 |
| US Code, tit 42, § 416, subd(h), par(3), cl(A) | Social Security. Defines a child of an insured individual as one who[m] the insured person has acknowledged in writing as his child or has been decreed by the court to be the father of such child. | 1935 |

both Federal and State decisions of more recent years give
witness to a reconsideration of the harshness of the law's treat-

| | | |
|---|---|---|
| US Code, tit 8, § 1409 | Nationality and Citizenship. Childen born out of wedlock. A child born out of wedlock of a service parent is also to be considered a national and citizen of the United States at birth. | 1952 |
| US Code, tit 8, § 1432 | A child born out of wedlock to an alien mother may become a citizen in certain circumstances when such mother is naturalized prior to the sixteenth birthday of said child. | 1952 |
| US Code, tit 38, § 101, subd(4), par(C) | Veterans Benefits Act. Defines a child as including an illegitimate if the father has acknowledged the child in writing or has been judicially decreed to be the father of such child. | 1958 |
| US Code, tit 38, § 765 | Payment of servicemen's life insurance under group policy. Benefits may be made to certain specified persons and defines 'child' in the following manner: 'An illegitimate child as to the mother, or an illegitimate child as to the alleged father' if he has acknowledged said child in writing or has been judicially decreed to be the father of such child. | 1971 |
| US Code, tit 37, § 401 | Allowances. In connection with military pay and allowances the word 'dependent' includes an illegitimate child whose alleged father, a member of the armed forces [,] has been judicially decreed to be the father. | 1973 |
| US Code, tit 42, § 654 | Social Security. Provides that in a State plan for child support the State will undertake to establish the paternity of a child 'born out of wedlock'." | 1975 |

ment of illegitimate children. See notes 8, 9, and 11, *supra.* Finally, we note that our own Legislature recently has declared in another context: "Children born to parents who are not married to each other shall be entitled to the same rights and protections of the law as all other children. G. L. c. 209C, § 1, inserted by St. 1986, c. 310, § 16.

Thus, if the rule excluding nonmarital children from judicial construction of the word "issue" was not archaic when this court reiterated it in 1947, it has become so. We cannot say that the attitudes underlying that rule, as expressed in *Cooley, supra,* are so widely held in this Commonwealth today as to warrant our imputation of them to donors and testators who use the word "issue" without explication. Rather, we think that the following sentiment, voiced by the Supreme Court of the United States almost fifteen years ago, comes much nearer to the mark:

> "The status of illegitimacy has expressed through the ages society's condemnation of irresponsible liaisons beyond the bonds of marriage. But visiting this condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual — as well as an unjust — way of deterring the parent." (Footnote omitted.) *Weber* v. *Aetna Casualty & Sur. Co.,* 406 U.S. 164, 175 (1972).

Ours is an era in which logic and compassion have impelled the law toward unburdening children from the stigma and the disadvantages heretofore attendant upon the status of illegitimacy. Consequently, we think it more appropriate henceforth to place the burden of exclusion on those donors who insist on it. Therefore, we overrule so much of *Mishou* as depends

upon the traditional rule of construction;[13] and we conclude that the word "issue," absent clear expressions of a contrary intent, must be construed to include all biological descendants.[14]

A crucial question remains concerning the applicability of the rule we announce today to the parties at bar. "[T]he general rule is in favor of retroactive application of a change in decisional law, . . . [but] [p]rimarily because of concern for litigants and others who have relied on existing precedents, judicial changes in Massachusetts contract and property law have been given only prospective effect." (Citations omitted.) *Payton* v. *Abbott Labs,* 386 Mass. 540, 565 (1982), and cases cited. See also *Sullivan* v. *Burkin,* 390 Mass. 864, 870-871 (1984) (statutory interpretation allowing surviving spouse to reach assets placed in inter vivos trust by deceased spouse held to apply only prospectively). The rule stated in *Mishou* appears to have been controlling in the Commonwealth for 150 years or more. As was said in *Sullivan, supra,* "The rule of *Kerwin* v. *Donaghy* [317 Mass. 559 (1945)] has been adhered to in this Commonwealth for almost forty years . . . . The Bar has been entitled reasonably to rely on that rule in advising clients. In the area of property law, the retroactive invalidation of an established principle is to be undertaken with great caution."

---

[13] In *Mishou,* the court stated: "If this rule of construction is deemed too harsh, the remedy is not to be found in sudden and unheralded changes by judicial decision in the meanings of words which have long been established and accepted and in reliance upon which wills have been drafted and settlements of property effected." *Mishou, supra* at 636. Now, almost forty years later, we do not think the change we announce is sudden or unheralded in any way. As will become clear, *infra,* our limitation of the new rule to prospective application effectively obviates the *Mishou* court's concern for the reliance interests of donors and testators now deceased.

[14] In *Mishou,* it was observed that the traditional rule of construction was contrary to the Restatement of Property §§ 265, 286, and 292 (1940). *Mishou, supra* at 636. While abandoning the traditional rule, we do not adopt these sections of the Restatement. The rule we do adopt is substantially in accord with § 292, but these sections of the Restatement treat questions not reached here — for example, whether the term "children" is to be construed as including or excluding nonmarital descendants. See, e.g., §§ 286 and 292 comment a.

We conclude, then, that the new rule of construction applies only to trust instruments executed after the date of this opinion.[15]

The case is remanded to the Probate and Family Court for Suffolk County for entry of a declaration that, under the law applicable when the trust instrument was executed, the unexplained word "issue" is presumed to encompass only lawful lineal descendants of the donor.

*So ordered.*

ABRAMS, J. (concurring in part and dissenting in part, with whom Hennessey, C.J., and Nolan, J., join). I join in the court's decision to announce the new rule of construction which defines "issue" to include all biological descendants regardless of the marital status of the parents, overruling the rule of construction of *Fiduciary Trust Co. v. Mishou,* 321 Mass. 615 (1947). I cannot agree, however, with the court's determination that the new rule not apply in this case.[1] There are two compelling reasons to apply the rule announced in a decision to the litigants involved.

First, by merely announcing the new rule without applying it, the court's action amounts to no more than dictum. *Myers v. Drozda,* 180 Neb. 183 (1966). *Kojis v. Doctors Hosp.,* 12 Wis. 2d 367, 373-374 (1961). *Molitor v. Kaneland Community Unit Dist. No. 302,* 18 Ill. 2d 11, 28 (1959), cert. denied, 362

---

[15] We note that the dissent relies primarily on authorities from other jurisdictions, and also that many of those authorities do not involve property law, where reliance on existing precedent plays a significant role in settling the rights of parties. Additionally, we have a well established body of law on the issue of retroactive application of a new rule of civil law.

[1] There is no constitutional problem in applying the new rule to the child in this case. *Great N. Ry. v. Sunburst Oil & Ref. Co.,* 287 U.S. 358, 364 (1932). See, e.g., *Molitor v. Kaneland Community Unit Dist. No. 302,* 18 Ill. 2d 11, 28 (1959). cert. denied, 362 U.S. 968 (1960); *Parker v. Port Huron Hosp.,* 361 Mich. 1, 26-27 (1960); Case Comment, Prospective — Retroactive Overruling: Remanding Cases Pending Legislative Determinations of Law, 58 B.U.L. Rev. 818 (1978).

U.S. 968 (1960). Note, The Retroactivity of Minnesota Supreme Court Personal Injury Decisions, 6 Wm. Mitchell L. Rev. 179, 184 (1980); Schaefer, The Control of "Sunbursts": Techniques of Prospective Overruling, 42 N.Y.U.L. Rev. 631, 638 (1967). The court is commenting on an issue which is irrelevant to the disposition of the case. Currie, Suitcase Divorce in the Conflict of Laws: *Simons, Rosenstiel,* and *Borax,* 34 U. Chi. L. Rev. 26, 61 (1966).

Second, and more importantly, prospective overruling results in excluding the particular plaintiff and has the potential to remove any incentive to bring challenges to existing precedent because the appellant is deprived of the benefit for the work and expense involved in challenging the old rule, which is admittedly erroneous. See *Molitor, supra* at 28; *Myers, supra* at 187; *Kojis, supra* at 373. To encourage parties in future cases to raise issues which reform and rid the law of antiquated legal doctrines, they should be given the benefit of the new rule. Schaefer, *supra.*

Courts in other States have applied a new rule or a change in the law to the plaintiff challenging the rule. See, e.g., *Nga Li* v. *Yellow Cab Co.,* 13 Cal. 3d 804 (1975); *Dawson* v. *Olson,* 94 Idaho 636, 639-640 (1972); *Barker* v. *St. Louis County,* 340 Mo. 986 (1937); *Myers* v. *Drozda,* 180 Neb. 183 (1966).[2] Moreover, where the issue has arisen either explicitly or implicitly in the various contexts, from negligence and charitable immunity[3] to estate and family law to the property

---

[2] Many courts apply the new rule to the parties without extended discussions. See, e.g., *In re Estate of Mertes,* 34 Ill. App. 3d 557 (1975) (trust construction); *Farmers Bank & Capital Trust Co.* v. *Hulette,* 293 S.W.2d 458 (Ky. 1956) (wills' construction); *Cooper* v. *Government Employees Ins. Co.,* 51 N.J. 86 (1968) (contracts); *Pendergrast* v. *Aiken,* 293 N.C. 201 (1977) (property); *Pickering* v. *American Employers Ins. Co.,* 109 R.I. 143 (1971) (contracts).

[3] In *Payton* v. *Abbott Labs,* 386 Mass. 540, 565 (1982), we noted that the reliance interest plays a much smaller part in tort law than in property or contract law. But, at least as to tort decisions involving the abolition of immunities, courts have noted that the reliance interest is fairly great. See, e.g., *Myers, supra; Terracciona* v. *Magee,* 53 N.J. Super. 557 (1959). Due to this reliance, courts have adopted innovative solutions to the question of retroactivity, see *Myers, supra* (decision partially retroactive as to all insured charities), while still applying the new rule to the instant case.

rules dealing with the problem of surface water, courts have applied the new rule to the appellant. See *In re Marriage of Brown,* 15 Cal. 3d 838 (1976) (community property); *Nga Li, supra* (negligence); *Matter of Hoffman,* 53 A.D.2d 55 (N.Y. 1976) (wills' construction); *State* v. *Deetz,* 66 Wis. 2d 1 (1974) (common enemy rule of property); *Kojis, supra* (charitable immunity). Courts apply the new rule to the case at issue, in part because of the public policy consideration of encouraging litigants to initiate challenges which bring about needed changes in the law.[4] See *Nga Li, supra* at 829-380; *Molitor, supra*; *Barker, supra* at 1003.

The court's primary concern in declining to apply the rule announced today to the parties here appears to be the reliance interest of the Bar.[5] I agree with the court that in the areas of contract and property law "retroactive invalidation of an established principle is to be undertaken with great caution." *Sullivan* v. *Burkin,* 390 Mass. 864, 871 (1984). But, by applying the decision retroactively to the parties before the court, the court does not sacrifice the caution so important in the development of new rules in this area of the law.

The court relies on *Sullivan, supra,* to conclude that the new rule of construction is not determinative of this case. In *Sullivan,*

---

[4] Uneven treatment arguably results if only the litigant is benefited by the new rule and similarly situated individuals are not benefited, having to proceed instead under the old rule. But, as the Supreme Court stated, "the fact that the parties involved are chance beneficiaries [is] an insignificant cost for adherence to sound principles of decision-making." *Stovall* v. *Denno,* 388 U.S. 293, 301 (1967). One commentator has explained this inequity in treatment by suggesting that the individual "who successfully challenges existing legal doctrine can be, and has been, regarded as having thereby set himself apart." Schaefer, *supra* at 638.

[5] There is some indication that this reliance interest has been overemphasized by courts. One commentator quotes Justice Cardozo as saying that "[m]y impression is that the instances of honest reliance and genuine disappointment are rarer than they are commonly supposed to be by those who exalt the virtues of stability and certainty." Note, Prospective Overruling and Retroactive Application in the Federal Courts, 71 Yale L.J. 907, 946 n.194 (1962), quoting Cardozo, Address Before the New York State Bar Association, 55 Rep. N.Y. State Bar Ass'n 263, 295 (Jan. 22, 1932). See Levy, Realist Jurisprudence and Prospective Overruling, 109 U. Pa. L. Rev. 1, 28-29 (1960).

a widow sought a determination that the assets held in an inter
vivos trust were part of her husband's estate for purposes of
establishing her statutory share. The old rule did not permit
the surviving spouse to reach assets in an inter vivos trust. It
is clear that the husband in *Sullivan,* through the organization
of his affairs and the contents of his will, seemed to be fully
aware of this old rule and explicitly sought its protection to
prevent his wife from obtaining any of his assets. Therefore,
due to the reliance on this old rule, the court denied the widow
relief, although the rule was altered prospectively to permit a
surviving spouse to reach assets in an inter vivos trust. *Id.*

Unlike the situation in *Sullivan,* the intent of this donor in
1959 when she established this trust is far from clear. In fact,
it is likely that the donor did not have any "intention at all
with respect to the question facing us in this case."[6] *Boston
Safe Deposit & Trust Co.* v. *Fleming,* 361 Mass. 172, 186
(Braucher, J., dissenting), appeal dismissed, 409 U.S. 813
(1972). Similarly, the New York Appellate Division, in facing
an analogous question, noted that it cannot "be said with any
degree of assurance that at the time [the testatrix] executed her
will she was provided with an explanation of the word 'issue'
which appeared on the typewritten pages of that document."
*Matter of Hoffman,* 53 A.D.2d 55, 63 (N.Y. 1976). See *Matter
of the Estate of Best,* 66 N.Y.2d 151, 153 (1985) (accepting
*Hoffman* definition of issue to include legitimate and illegiti-
mate children), cert. denied sub nom. *McCollum* v. *Reid,* 475
U.S. 1083 (1986).

Similarly, the Wisconsin court, in carving out an exception
to the traditional rule of construction if the illegitimate child
is a member of the family circle, noted that once statutes and
legal presumption are put aside, there is nothing in the record
to indicate that the donor would not have intended to include
this particular child.[7] *In re Trust of Parsons,* 56 Wis. 2d 613,

---

[6] While the attorney perhaps understood the legal significance of the terms
he selected, it is not clear on this record that the donor had any such
understanding.

[7] Moreover, all of the living beneficiaries of this trust have been notified
of this action, and the record before us indicates that those beneficiaries
have not objected to the inclusion of this child as a beneficiary.

617 (1973). Because the donor's intent cannot be discerned from the trust instrument and the court today seeks to "unburden[ ] children from the stigma and the disadvantages heretofore attendant upon the status of illegitimacy," *ante* at 661, I would not perpetuate the harshness of the traditional rule of construction to deny this nonmarital child[8] participation in the donor's trust.

By giving relief in this case, the court does not harm the reliance interest of the Bar.[9]

It is hard to understand why the Bar's reliance should come before the interests of the child, and the reason articulated by the court does not compel such an unjust result. In fact, the court, by not granting relief in this case removes the incentive of the Bar to change rules which are no longer useful or relevant. The potential negative ramifications which flow from the court's decision today on the incentive of attorneys to challenge outmoded legal doctrine may be avoided by granting relief in this case. Although the court criticizes the injustice of the law's treatment of nonmarital children in the past, claiming that "[o]urs is an era in which logic and compassion" dictate that nonmarital children should no longer be stigmatized, *ante,* it imposes punitive treatment on this particular nonmarital child. The cruel irony of the court's decision is that not only does this child not receive the benefit of the change she brought about in the law, but, prior to this decision, she was receiving payment from the trust and now, as a result of the decision, she can no longer receive these payments. I respectfully dissent on the failure of the court to apply the new rule to this case.

[8] It is of no consequence that this suit was initiated by the trustee instead of the child. As has happened in the past, the trustee may bring an action to resolve a question concerning the distribution of a trust. See *Boston Safe Deposit & Trust Co.* v. *Fleming,* 361 Mass. 172 (1972).

[9] In fact, the court itself questions whether the attitudes expressed in *Cooley* v. *Dewey,* 4 Pick. 93, 94 (1827), were representative of that era. If that case were not a reflection of the attitude at the time it was written and it surely is not representative of current views, it is difficult to understand why this reliance interest should control the outcome in this case. The stated reason for this result, the reliance of the Bar, is more than adequately protected by allowing the Bar to adhere to the old rule for trusts executed prior to the date of this decision, while applying the new rule to the person making a successful challenge.