NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-1053                                    Appeals Court

WILLIAM A. LOWELL, trustee,[1] vs.  MARIA OAKES TALCOTT & others;[2]
   ARNOLD W. HUNNEWELL, JR., & another,[3] third-party defendants.


No. 13-P-1053.

Norfolk.     April 10, 2014.  -  August 18, 2014.

Present:  Graham, Wolohojian, & Milkey, JJ.


Trust, Beneficiary.  Devise and Legacy, Issue.  Legitimacy.
    Paternity.  Probate Court, Interpretation of trust
    instrument, Attorney's fees.  Practice, Civil, Attorney's
    fees.  Words, "Issue."


    Civil action commenced in the Norfolk Division of the
Probate and Family Court Department on September 28, 2010.

---

[1] Of the trusts under article second of the wills of Francis
J. Oakes, Jr., and Mary P. Oakes.  A suggestion of death and a
motion for substitution of parties as to William H. Coburn, Jr.,
the original plaintiff trustee, was filed below.  The motion
subsequently was allowed.

[2] Lucinda Trombly, Elisabeth Colford Perkins, Katharine Van
Buskirk, Elisabeth Van Buskirk Barter, David Van Buskirk, and
Juliana Colford Van Buskirk.  A suggestion of death of Juliana
Colford Van Buskirk was filed below.

[3] Elizabeth M. Hunnewell.  Both third-party defendants are
named as coexecutors of the estate of Francis O. Hunnewell,
former trustee of the trusts at issue.

The case was heard by George F. Phelan, J., on motions for summary judgment; a motion for attorney's fees and costs was heard by him; and the entry of final judgment was ordered by him.

James R. Knudsen for Maria Oakes Talcott.
Maureen E. Curran for Katharine Van Buskirk & others.
Steven E. Gurdin (A. Hether Cahill with him) for William A. Lowell & others.

GRAHAM, J.  In this case, we are asked to consider whether a child born in 1963 while her mother was married to a man who is not the child's father, is an "issue" of the mother as that term is used in the wills of the mother's grandparents, drafted in 1951.  We conclude that on the particular facts presented, she is.

Background.  In 1951, Francis J. Oakes, Jr., and his wife, Mary P. Oakes (collectively, testators), executed reciprocal wills leaving the bulk of their property in trust for the benefit of one another and their issue.  Francis[4] died on August 14, 1954, and Mary died on July 7, 1956.  Upon their deaths, pursuant to each will, separate trusts were created for each of their three daughters and their respective "issue."  Thus, two trusts were created for each daughter.  Only the trusts for their daughter, Elisabeth Oakes Colford, and her issue, are before us.

---

[4] We use the parties' first names to avoid confusion.

The wills provided for discretionary distributions of "net income and/or principal" to the testators' children or to the "issue of such child." The term "issue" is not defined in the wills. The trusts are to terminate twenty-one years after the death of the last survivor of those of the testators' issue who were living at the time of the testators' deaths, in equal shares per stirpes.

In 1955, Elisabeth's daughter, Juliana Colford Van Buskirk, married David Van Buskirk. Their daughters, Katharine and Elisabeth,[5] were born in 1956 and 1958 respectively. David filed for divorce on April 1, 1963, identifying Katharine and Elisabeth as children of the marriage. Juliana gave birth to her third daughter, Maria,[6] on October 1, 1963, before a decree of divorce had issued out of the Probate and Family Court, which was effective November 19, 1963.

No provisions for Maria were made in the divorce decree nor in a subsequent modification. David has averred that he had not had sexual relations with Juliana for more than one year before Maria was born. David never supported or otherwise parented Maria. Genetic marker tests performed during the course of this

---

[5] Katharine Van Buskirk and Elisabeth Van Buskirk Barter.

[6] Maria Oakes Talcott.

litigation indicate that Maria is not David's biological daughter.

Juliana filled out Maria's birth certificate and listed David as the father. Although David became aware of this and asserts he communicated with the city of Worcester and reported that he was not Maria's father, he took no steps to formally alter the birth certificate. On February 24, 1969, Maria was surrendered to the care of the entity then known as the Department of Public Welfare, and was adopted in 1973 by Donald and Janet Talcott. Although David averred that he did not recall being involved in the adoption process, court records reveal that the guardian ad litem interviewed David who "disclaimed parenthood" of Maria.

Juliana was placed under guardianship in 2003 by the Rhode Island Probate Court and, during the course of these proceedings, resided in a nursing facility in Rhode Island. The Probate and Family Court docket indicates that Juliana died on October 1, 2012. The record does not reflect whether she took a position in this matter.

Maria presented her birth certificate to the trustee[7] and claimed that she is a beneficiary of the Oakes testamentary

---

[7] Pursuant to the trust provisions, two trustees of the trusts were appointed. One trustee died in 2010, see note 3, supra, and he was not replaced.

trusts as an issue of Juliana. This action was commenced by the trustee, naming, in addition to Maria, David and the trust beneficiaries as defendants, and seeking instruction as to whether Maria is a beneficiary of the trusts. Maria filed a counterclaim seeking (i) an order establishing her status as a beneficiary, and (ii) damages for the trustee's breach of fiduciary duty. In addition, David and his biological daughters (collectively, Van Buskirk defendants) filed a cross claim against Maria seeking (i) a declaration that David is not Maria's biological father, (ii) an order instructing the city of Worcester to change Maria's birth certificate, and (iii) a declaration that Maria is not a beneficiary of the trusts.[8]

Cross motions for summary judgment ensued. A judge of the Probate and Family Court determined that because the genetic marker tests show that David is not Maria's biological daughter, she is not an "issue" of the testators' child as that term was understood in 1951. The judge entered summary judgment for the trustee and the Van Buskirk defendants, denied Maria's cross motion, and dismissed her counterclaim. Determining that Maria's pursuit of this action was frivolous after the genetic marker test revealed that David is not her biological father,

---

[8] The third request for relief was requested in the Van Buskirk defendants' motion for summary judgment.

the judge awarded costs and attorney's fees to the trustee. Maria appeals.

Discussion. The narrow question presented by the trustee's complaint for instructions is whether Maria qualifies as a beneficiary of the testamentary trusts. "The fundamental object in the construction of a will is to ascertain the testator's intention from the whole instrument, attributing due weight to all its language, considered in light of the circumstances known to the testator at the time of its execution, and to give effect to that intent unless some positive rule of law forbids." Putnam v. Putnam, 366 Mass. 261, 266 (1974). See Boston Safe Deposit & Trust Co. v. Wilbur, 431 Mass. 429, 433 (2000). See also, as to trusts, Powers v. Wilkinson, 399 Mass. 650, 653 (1987) ("It is fundamental that a trust instrument must be construed to give effect to the intention of the donor as ascertained from the language of the whole instrument considered in the light of circumstances known to the donor at the time of its execution"), quoting from Groden v. Kelley, 382 Mass. 333, 335 (1981). "The settled law in this Commonwealth is and has been that one executing a will or trust and distributing property thereby is entitled to rely on the law in effect at the time the instrument was created." Anderson v. BNY Mellon, N.A., 463 Mass. 299, 306-307 (2012). Thus, in the absence of a definition of "issue" in the wills, to resolve whether Maria is

an "issue" as that term is used in the wills, we look at how that term was used in 1951 when the testators' wills were executed.

It is well settled that in the Commonwealth in 1951, when the term "issue" was used in a will or a trust and was otherwise undefined, it did not include "illegitimate" children. Fiduciary Trust Co. v. Mishou, 321 Mass. 615, 635-636 (1947). See Powers, supra at 661-662; C.C. v. A.B., 406 Mass. 679, 683-684 (1990). In recognition of the legal disadvantages and stigma that illegitimacy attached to innocent children, along with changing societal attitudes, this "traditional rule of construction" has since been overruled such that "the word 'issue,' absent clear expressions of a contrary intent, must be construed to include all biological descendants." Powers, supra at 662. The court in Powers recognized the "quixotic" nature of attempting to enforce morality or preserve family values by rules of construction embedded in the law of trusts, and that "[o]urs is an era in which logic and compassion have impelled the law toward unburdening children from the stigma and the disadvantages heretofore attendant upon the status of illegitimacy." Id. at 659, 661. Nonetheless, because the bar had relied on existing precedent defining "issue" as only "legitimate" descendants, the Powers court held that the new rule of construction would apply only prospectively to

instruments executed after April 16, 1987.  Id. at 662-663.
Weller v. Tagge, 67 Mass. App. Ct. 446, 449 (2006).
Accordingly, in interpreting the testators' wills executed in
1951, we construe the term "issue" to include only "legitimate"
descendants.

Even by 1951, however, there had been some recognition of
the unfair burdens illegitimacy placed on innocent children.
Consequently, although the term "issue" was construed to include
legitimate descendants only, there also existed a corresponding
"strong legal presumption" that a child born in lawful wedlock
was legitimate.  C.C., 406 Mass. at 684.  It has been explained
that, "While the law has always recognized that a child born to
a married woman could nonetheless be an illegitimate child, it
created a strong presumption to avoid that result."  Ibid.
Rebuttal of the presumption of legitimacy at the time these
wills were executed required proof beyond a reasonable doubt
that either (1) the husband had no access to the wife during the
time of possible conception, or (2) the husband was impotent.
D.H. v. R.R., 461 Mass. 756, 760 (2012).  It was not until 1957
that the Supreme Judicial Court recognized that a properly
conducted blood grouping test also could exclude the husband as
the father.  Ibid., citing Commonwealth v. Stappen, 336 Mass.
174, 177 (1957).  Moreover, at the time the wills were executed,
husbands and wives were incompetent to testify as to nonaccess

to prove the illegitimacy of offspring.  See Taylor v. Whittier, 240 Mass. 514, 515-516 (1922); Sayles v. Sayles, 323 Mass. 66, 67 (1948).

Thus, when Maria's maternal great-grandparents created their wills, we presume they understood both that the term "issue" meant "legitimate" biological descendants, and that a child born to a married woman was presumed to be "legitimate." Moreover, where the heavy burden of rebutting the presumption of legitimacy at that time would have turned on witness testimony rather than medical testing, had they anticipated a challenge to the legitimacy of a child born to one of their issue, they surely would have expected such a challenge to be pursued within a reasonable amount of time after the child's birth.

Here, there is no question that Maria is the biological great-granddaughter of the testators and that she was born while her mother was lawfully married, albeit to a man who was not Maria's father.  When Maria was born, neither her mother's husband nor Maria's biological father legally challenged her legitimacy status.  David was aware that he was listed as Maria's father on her birth certificate yet took no legal steps to have his name removed.  As we stated supra, records indicate that when he was contacted regarding whether he objected to Maria's adoption, he "disclaimed parenthood," but made no effort to seek a judgment of nonpaternity or to amend her birth

certificate.  During all of this time, the presumption of legitimacy applied.

By law, for the first forty-eight years of her life, Maria was considered the "legitimate" issue of Juliana.  During this period, Maria's right to receive discretionary distributions from the testamentary trusts vested.  Anderson, 463 Mass. at 309-310.  She presented to the trustee a legal birth certificate which established that she was born to the testators' granddaughter while their granddaughter was married to David. We think it unreasonable to presume the testators intended that by use of the term "issue," some forty-eight years after their biological great-granddaughter's "legitimate" birth, her status as a beneficiary of the trusts could be usurped by proceedings challenging not her biological connection to them, but challenging whether their granddaughter's husband had fathered her.

In the circumstances presented, we recognize a distinction between the terms "paternity" and "legitimacy" and conclude that the judge's focus solely on "paternity" was misplaced.  David has no biological connection to the testators and the fact that he is not Maria's biological father is not dispositive of determining whether Maria is the testators' children's issue as that term is used in the wills.  For the purposes of interpreting the testamentary trusts at issue, David's paternity

challenge does not alter Maria's legitimacy status both at birth and for the forty-eight years prior to the genetic marker test, or her status as a vested beneficiary of the testamentary trusts.

The beneficiary defendants argue that Maria's argument for inclusion in the trusts relies on a "presumption" rather than the "truth."  We note, however, that the construction of "issue" that arose in the common law was inconsistent with the then-existing dictionary definition, which made no distinction between legitimate and illegitimate biological descendants.  Powers, 399 Mass. at 653.  Rather, the common-law definition apparently reflected "society's condemnation of irresponsible liaisons beyond the bonds of marriage" and efforts to enforce morality or to preserve traditional family values.  Id. at 661, quoting from Weber v. Aetna Cas. & Sur. Co., 406 U.S. 164, 175 (1972).  Even if the testators had these considerations in mind, none of them is furthered by challenging the legitimacy of the birth of their biological great-granddaughter some forty-eight years after her birth, after their granddaughter had been placed under guardianship and, in fact, since has died.

Moreover, in abrogating the construction of "issue" to mean only "legitimate" descendants, the Powers court noted that an 1827 case appeared to be "the most recent judicial airing of the reasons for the [common-law] rule," and stated that it was

questionable whether the attitudes expressed in that opinion were representative even of its own era as the Legislature mitigated the nonmarital child's status within two years after the decision when it enacted a statute making such children heirs of their mothers for purposes of intestate succession. Id. at 658, citing Cooley v. Dewey, 4 Pick. 93, 94 (1827). The Powers court further opined that "if the rule excluding nonmarital children from judicial construction of the word 'issue' was not archaic when this court reiterated it in 1947, it has become so." Id. at 661.

Even assuming, as we must, that the testators were aware that use of the term "issue" meant "legitimate" descendants, there is no indication in their wills that they desired to resort to legal proceedings to rebut the presumption of legitimacy that they knew would apply to children born to their married biological descendants. For all of the foregoing reasons, therefore, we discern no impediment to Maria's status as a beneficiary of the Oakes testamentary trusts.

We comment briefly on David's standing in this case. David is neither a donor to, nor a beneficiary of, the trusts. He divorced Maria's mother more than fifty years ago. That his adult daughters are beneficiaries of the trusts gives him no standing. While we do not deny that he has an interest in establishing his nonpaternity of Maria for the purpose, if no

other, of estate planning, he had no standing to do so in the course of the trustee's petition for instruction. Nor has there been any showing that he has a personal interest in bastardizing Maria. Nevertheless, because his cross claim raised a viable paternity issue, we cannot say the judge erred in denying Maria's motion to strike his appearance.

The judge entered a judgment of nonpaternity and instructed the city of Worcester to amend Maria's birth certificate. We discern no error in these orders; they are separate issues from Maria's status as a beneficiary of the trusts. Maria does not refute the paternity tests and concedes that David is not her biological father. We do hold that the judge's orders, however, have no effect on Maria's status as a beneficiary of the Oakes testamentary trusts.

We reverse so much of the September 16, 2012, judgment as allowed summary judgment in favor of the trustee and the beneficiary defendants on the issues whether Maria is an issue of the testators and is a permissible beneficiary of their trusts. A new portion of the judgment shall enter declaring Maria an issue of the Oakeses and a beneficiary of the Oakes testamentary trusts. In all other respects, the September 16, 2012, judgment is affirmed. Furthermore, we vacate the so-called "further judgment" entered on November 7, 2012, dismissing Maria's counterclaim for breach of fiduciary duty in

order that the probate judge can consider that claim on the merits in the first instance. We remand the case for further proceedings consistent with this opinion. In addition, the order requiring Maria to pay $15,332.06 in attorney's fees to the trustee's counsel is vacated.[9],[10]

---

[9] Under G. L. c. 231, § 6G, a party aggrieved by an order awarding attorney's fees pursuant to G. L. c. 231, § 6F, must file an appeal within ten days of receiving notice of the attorney's fees order, to the single justice of the Appeals Court; this appeal is separate from any appeal from the underlying judgment. See Danger Rec., Inc. v. Berger, 444 Mass. 1, 8 (2005). "[T]he statute contemplates two separate appeals, one from a judgment, which goes to a panel of this court . . ., and one from the award of attorney's fees." Bailey v. Shriberg, 31 Mass. App. Ct. 277, 282-283 (1991).

Here, Maria timely filed two notices of appeal, one from the judgment (and then from the further judgment), and one from the attorney's fees order. The appeal from the attorney's fees order, if the record had been assembled, would have been stayed in the normal course, pending resolution of the underlying appeal. Id. at 283. However, the clerk of the Probate and Family Court failed to "forward the motion, the court's findings and award, and any other documents relevant to the appeal to the clerk" of the Appeals Court. G. L. c. 231, § 6G, as appearing in St. 1992, c. 133, § 561. See Mass.R.A.P. 9, as amended, 417 Mass. 1601 (1994). In light of our decision in the underlying appeal, it seems "too late now," as well as not in the interest of judicial economy, to proceed in that manner by ordering the probate clerk to assemble the record. Bailey, supra at 283. Compare Strand v. Herrick & Smith, 396 Mass. 783, 791 n.8 (1986) ("implicit in our reversal on the merits is a finding that Strand's action was not 'insubstantial, frivolous and not advanced in good faith' within the meaning of c. 231, § 6F"); Danger Rec., Inc., supra at 9 ("decision on appeal from the judgment . . . has the potential to render the § 6G appeal moot").

So <u>ordered</u>.

---

We also note that, contrary to the assertion in the trustee's appellate brief, Maria was not required to pay a filing fee for her § 6G appeal to the single justice.  Appeals pursuant to § 6G are entered automatically onto the court's docket and no fee is due.

[10] We decline the trustee's and the beneficiary defendants' requests for appellate attorney's fees and costs.