[No. 61222-1-I.   Division One.   December 8, 2008.]

*In the Matter of the Estate of* JOSEPHINE S. WRIGHT.

JUDITH PATTERSON, *Appellant*, v. JANET ROSA, *as Personal Representative, Respondent.*

*Michael Olver* and *Christopher C. Lee* (of *Betts Patterson & Mines, PS*), for appellant.

*James R. Hermsen* and *Shawn J. Larson-Bright* (of *Dorsey & Whitney, LLP*); and *Bruce R. Moen*, for respondent.

¶1 DWYER, J. — Judith Patterson claims that she is the daughter of former Exxon president and chairman Myron A. Wright and a woman, not his wife, with whom he had a love affair long ago. Based on this claim, Patterson petitioned the superior court for a determination that she is a beneficiary of the estate of Josephine Wright, Myron Wright's widow. Josephine Wright died testate, leaving a will that devised a portion of her residuary estate to the "lawful descendants" of Mr. Wright. The personal representative of Josephine Wright's estate, Janet Rosa, opposed Patterson's petition, contending that Josephine Wright's use of the term "lawful descendants" demonstrated her intent to limit her bequest to those of Myron Wright's children and their offspring born to legally married parents. The superior court agreed and dismissed Patterson's petition. Patterson appeals, raising two questions as yet unaddressed by Washington's courts: may the use of the term "lawful descendants" in a will manifest the intent on the part of a testatrix to limit a class gift to children of married parents and, if so, does it violate any applicable constitutional provision for probate courts to give effect to such intent? Answering the first question in the affirmative and the second question in the negative, we affirm the judgment of the superior court.

I

¶2 Patterson's mother, Ethel Williams, gave birth to Patterson in 1956, naming her Judy Diane Bryant (Bryant

being Williams's maiden name). When Patterson was born, Williams was married to Robert Harris, and went by the name Ethel Harris. Soon after Patterson's birth, Williams put her up for adoption. Patterson was adopted and raised by Williams's acquaintance, Sarah Sue Adams, and her husband, George Adams.

¶3 The Adamses did not inform Patterson of her natural parents' identities. As an adult, while attempting to discover the names of her biological parents, Patterson became convinced that her biological father was a man named David Townsend, one of Ethel Williams's ex-husbands. Williams learned of Patterson's belief regarding her paternity and contacted Patterson to inform her that, while she was indeed Patterson's mother, Townsend was not Patterson's father.

¶4 Williams told Patterson that her biological father was a man that Williams had known only as "M.A. Wright," with whom she had engaged in a brief love affair in Tulsa, Oklahoma, in 1955. Williams could recount little about M.A. Wright, but told Patterson that she believed that he had worked for the Humble Oil Company and that he had been a friend of numerous prominent oilmen and industrialists whom she claimed to have met in Tulsa at the time, including J. Paul Getty and Howard Hughes. According to Williams, M.A. Wright left Tulsa when he discovered that she was pregnant with Patterson. Williams asserted that M.A. Wright later tried to send her checks, oil deeds, and other valuable papers, but that her mother and aunt stole them from her.

¶5 Based on Williams's story, Patterson contacted Myron Wright by telephone at his Exxon office in 1990. The content of this and subsequent conversations between Patterson and Myron Wright is disputed, but the parties agree that Patterson repeatedly called Wright, that Patterson relayed Williams's claims about Patterson's paternity to Wright, and that Wright denied being Patterson's father.

¶6 Myron Wright died testate in 1992, leaving a will executed that year, approximately two years after Patterson

first contacted him claiming to be his daughter. His will was probated in Texas. Patterson, at the time going by the name Judith Diane Walker, entered an appearance in the Texas probate proceeding and filed a "Claim on the Estate" of Myron Wright. Patterson requested that the court recognize her as a natural heir of Myron Wright and award her a "just and equitable division" of his estate. The only evidence entered in support of Patterson's paternity, upon which she based her claim, was the story that Patterson had been told by Williams.[1]

¶7 Josephine Wright, serving as executrix of Myron Wright's estate, opposed Patterson's attempt to intervene in the probate, denied that Patterson was Myron Wright's daughter, and denied that Patterson had any right to recover as an heir of Myron Wright's estate. Myron Wright's will defined his "issue" as his "lawful descendants." The will also specified that Myron Wright's "only issue living" were his "daughter, Judith Wright Reid, and her child, Laura Reid." The will also expressly distinguished "issue" from "heirs at law," or those persons who would be entitled to inherit under the laws of intestacy. Finally, the will expressly provided that adopted persons were to be considered the "lawful descendants" of their adopting parents and the adopting parents as the ancestors of those adopted. Patterson was nowhere mentioned in Myron Wright's will.

¶8 It soon became clear that Patterson's attorney in the Texas probate proceeding was not actually admitted to practice law in Texas. Upon discovering this, the Texas court struck all of Patterson's pleadings in the matter. Patterson filed no further claims on Myron Wright's estate.

¶9 Approximately 12 years after the death of Myron Wright, Josephine Wright died in Washington state. She

---

[1] Patterson claims that, during the Texas probate proceeding, a sample of her blood was taken and tested and that this test confirmed that Myron Wright was her father, resulting in her being offered $50,000 to settle her claim against Myron Wright's estate. Attorneys for both Myron Wright's estate and Josephine Wright (as the estate's executrix) filed sworn pleadings averring that neither the blood test nor the settlement offer ever occurred.

also left a will disposing of her estate, much of which had passed to her by devise from the estate of her late husband. Josephine Wright's will was identical in many respects to that of Myron Wright. The will identified Josephine Wright's living issue by name and specified that "[r]eferences to 'issue' mean a lawful descendant or lawful descendants in any degree of the ancestor designated." The will also expressly distinguished "issue" from "heirs at law." Also, as in Myron Wright's will, Josephine Wright's will expressly provided that an adopted child was the "lawful descendant" of the adopting parents. The will gifted two-thirds of Josephine Wright's residuary estate to the "issue" of Myron Wright. The will was entered into probate in the King County Superior Court in July 2004.

¶10 In January 2007, after the bulk of Josephine Wright's estate had been distributed, Patterson filed a petition to recover under the will pursuant to the Trust and Estate Dispute Resolution Act (TEDRA).[2] The petition sought a determination that Myron Wright was Patterson's father and that, as such, Patterson was entitled to recover as a beneficiary of Josephine Wright's will.

¶11 The personal representative of the estate answered and opposed Patterson's TEDRA petition, filing numerous documents as supporting evidence for the proposition that neither of the Wrights had accepted that Patterson was Myron Wright's biological daughter and that Josephine Wright, specifically, had demonstrated her intent to prevent Patterson from inheriting by specifying that only "lawful descendants" of either her or Myron Wright—those descendants born to married parents—would be entitled to inherit from the residuary of her estate. Myron Wright's daughter, Judith Reid, separately filed an answer opposing Patterson's TEDRA petition.

¶12 Based on the pleadings filed and after a hearing, the superior court commissioner dismissed Patterson's petition. Patterson moved for reconsideration of this decision,

[2] Ch. 11.96A RCW.

which the commissioner denied. Patterson then sought revision of the commissioner's order before a judge of the superior court, who adopted the commissioner's decision as the decision of the court.

¶13 Patterson appeals.

## II

¶14 "On revision, the superior court reviews both the commissioner's findings of fact and conclusions of law de novo based upon the evidence and issues presented to the commissioner." *State v. Ramer*, 151 Wn.2d 106, 113, 86 P.3d 132 (2004).[3] " '[A]ppeal is from the superior court's decision, not the commissioner's.' " *Ramer*, 151 Wn.2d at 113 (quoting *State v. Hoffman*, 115 Wn. App. 91, 101, 60 P.3d 1261 (2003)). "An appellate court reviews de novo the trial court's interpretation of a will." *Woodard v. Gramlow*, 123 Wn. App. 522, 526, 95 P.3d 1244 (2004).[4]

## III

¶15 Patterson contends that the superior court erred by determining that she was not eligible to recover under the terms of Josephine Wright's will. According to Patterson, this is so because the term "lawful descendants" of Myron Wright, describing a class of persons who are eligible to recover under the residuary provision of the will, must be construed consistent with Washington's announced public policy of treating the children of married and unmarried parents equally, as reflected in our intestacy laws. The personal representative responds that the intestacy statutes are irrelevant because Josephine Wright died with a

---

[3] In those rare instances wherein the evidence before the commissioner included live testimony, a different standard of review may apply. *See In re Marriage of Moody*, 137 Wn.2d 979, 993, 976 P.2d 1240 (1999).

[4] The parties disagree about whether we must presume that Patterson is Myron Wright's child. This disagreement need not be resolved, as it has little relevance to Josephine Wright's intent as testatrix, the actual issue presented herein.

will, and that the terms of that will reflect her intent that the term "lawful descendants," as applied to Myron Wright, refers only to those of Myron Wright's descendants born to married parents. We agree with the personal representative and hold that Josephine Wright's will, when examined as a whole, demonstrates her intent to limit her bequest to those of Myron Wright's descendants born to legally married parents.

¶16 "[T]he paramount duty of a court in construing and interpreting the language of a will is to determine and implement the intent of the testator or testatrix." *In re Estate of Newbert*, 16 Wn. App. 327, 330, 555 P.2d 1189 (1976) (citing RCW 11.12.230; *In re Estate of Griffen*, 86 Wn.2d 223, 543 P.2d 245 (1975)). We determine the testatrix's intent based on the provisions of the will itself. *In re Estate of Bergau*, 103 Wn.2d 431, 435, 693 P.2d 703 (1985). We consider the entire will and give effect to every part. *In re Estate of Price*, 73 Wn. App. 745, 754, 871 P.2d 1079 (1994). We may consider extrinsic evidence to explain the language of the will only if the terms of the will manifesting the testatrix's intent are ambiguous. *Price*, 73 Wn. App. at 754. The terms of a testamentary instrument are ambiguous if they are susceptible to more than one meaning. *Waits v. Hamlin*, 55 Wn. App. 193, 200, 776 P.2d 1003 (1989).

¶17 No Washington cases have examined the meaning of the modifier "lawful" in relation to words such as "children," "issue," or "descendants" that are used in wills and trust instruments to describe adoptive[5] or lineal parental relations. However, courts in numerous other states have examined whether the term constitutes the legal manifestation of the intent to limit a class gift to the children of married parents.

---

[5] Numerous cases across the nation have examined the term "lawful" as it relates to adopted children. To be explicit: nothing in this opinion is based on, or should be construed as commenting on, the term as it applies to adoptive relationships, as opposed to the marital status of a person's parents.

¶18 The great majority of courts that have examined the question have concluded that, when used in a testamentary instrument to modify words such as "children," "issue," or "descendants," the word "lawful" must be read as representing the intent to limit a bequest to children of legally married parents. For example, in *In re Accounting of Bank of New York*, New York's intermediate appellate court made clear that courts could not *presume* that the unmodified phrase "issue" excluded children of unmarried parents. 53 A.D.2d 55, 66-67, 385 N.Y.S.2d 49 (1976). The court, however, expressly limited the reach of its holding, stating, "we do no more in this appeal than hold that the word 'issue' as used by testatrix in her will should have no meaning other than that ordinarily and customarily imputed to persons in its usage *in the absence of any manifestation of an intent to the contrary.*" *Bank of N.Y.*, 53 A.D.2d at 66-67 (emphasis added). The court's rationale was explicitly based on the idea that, had the testatrix intended to exclude children of unmarried parents from her bequest, she could have manifested that intent by modifying the word "issue" with the word "lawful." *Bank of N.Y.*, 53 A.D.2d at 60 (" 'when this word relating to children is qualified by the adjective "lawful," it is ordinarily understood to mean those begotten and born in lawful wedlock and none others' " (quoting *Cent. Trust Co. of N.Y. v. Skillin*, 154 A.D. 227, 229-30, 138 N.Y.S. 884 (1912))). This remains the law in New York. *See In re Estate of Kane*, 130 Misc. 2d 282, 282-83, 496 N.Y.S.2d 334 (Sur. Ct. 1985).

¶19 In construing the terms of Elvis Presley's will, the Tennessee Court of Appeals announced a similar rule, expressly rejecting the proposition that the deliberate use of the term "lawful" to describe children in a will "merely means that they must prove that they are children of the testator." *Presley v. Hanks*, 782 S.W.2d 482, 488-89 (Tenn. Ct. App. 1989); *accord Harris Trust & Sav. Bank v. Donovan*, 145 Ill. 2d 166, 173, 582 N.E.2d 120, 163 Ill. Dec. 854 (1991); *Carey v. Jaynes*, 265 S.W.3d 801 (Ky. Ct. App. 2008); *Traders Bank of Kansas City v. Goulding*, 711 S.W.2d 872, 875 (Mo. 1986).

¶20 Patterson addresses none of this authority directly and cites to no persuasive contrary authority. Indeed, one of the cases to which she cites, *Reed's Estate*, 16 Pa. D. & C. 36 (1931), is irrelevant, as it does not actually address the impact of parental marital status on inheritance. The only other case upon which Patterson relies, *Estate of Moulton*, 63 Cal. App. 3d 1, 133 Cal. Rptr. 500 (1976), addresses whether "lawful" is inclusive of persons *adopted* by the beneficiary, an entirely different issue than the one here presented. There is nothing in the record indicating that Myron Wright recognized Patterson as his daughter, much less that he adopted her.[6]

¶21 Patterson's argument is not really based on case law, however. Instead, she contends that Washington's intestacy statutes establish that, in this state at least, when the term "lawful" is used as a modifier of "descendants" in a will, it signifies the intent on the part of the testatrix to describe those descendants who would be legally entitled to recover from an estate under the laws of intestacy. It bears observing, of course, that the laws of intestacy are by definition inapplicable when the decedent leaves a will. Notwithstanding this, however, Patterson contends that the intestacy statutes demonstrate that the legislature intended to establish as Washington's public policy that the children of wed and unwed parents be on equal footing with respect to matters of inheritance. Thus, according to Patterson, it would be directly in opposition to that announced policy to construe the term "lawful" in Josephine Wright's will in such a way as to bar inheritance by Patterson based on the marital status of her parents (whoever they may be).

---

[6] Although neither party appears to have located it, a solitary case does actually support Patterson's position. In *Bell v. Forti*, 85 Md. App. 345, 584 A.2d 77 (1991), the Maryland Court of Appeals determined that it was a question of material fact, precluding summary judgment, whether the testator's acknowledged child with a woman other than his wife was a "lawful descendant" for purposes of taking under his will. *Bell*, 85 Md. App. at 348, 353-54. It is questionable whether the *Bell* court's reasoning is sound for purposes of this adjudication, however. The *Bell* court did not mention, much less analyze, any of the prior cases that examined the issue or explain why the modifier "lawful" was included if it was not intended as a limitation on the word "descendant."

¶22 All this may be true; it is also true that "[w]here there is room for construction" in a testamentary instrument, "that meaning will be adopted which favors those who would inherit under the laws of intestacy." *In re Estate of Brooks*, 20 Wn. App. 311, 313, 579 P.2d 1351 (1978). Studied in a vacuum, the conflict between the overwhelming authority interpreting "lawful descendants" as limiting class gifts to children of married parents, on the one hand, and the legislature's announced preference for treating children of married and unmarried parents equally (combined with the rule that wills are to be construed consistently with the intestacy statutes), on the other, would seem to raise a particularly difficult question. However, what ultimately matters in this dispute is *Josephine Wright's intent* concerning the disposition of her estate, not that of the legislature. Thus, the question is *not* raised in a vacuum, but rather must be addressed solely in relation to Josephine Wright's will, examined as a whole.

¶23 The will, when examined as a whole, shows that Josephine Wright intended to exclude from inheriting any children that Myron Wright might have had with women to whom he was not married. First, and critically, Josephine Wright's will expressly distinguishes "heirs at law" (persons who would be entitled to inherit under intestacy laws) from "lawful descendants" (persons entitled to recover under the residuary provisions of the will). Accordingly, insofar as Patterson contends that the term "lawful" is ambiguous and so must be construed as meaning those persons entitled to inherit under the intestacy statute, her theory is contradicted by the express text of the will. Accepting Patterson's theory would render the distinction between the two groups described meaningless; both would be entitled to inherit under the independently designated terms of the will, interchangeably. To construe the will in such a fashion would be directly contrary to the long-standing principle that courts interpreting wills "must endeavor to give effect to every part of the will being construed, and must make a reasonable effort to reconcile two seemingly inconsistent

provisions, bearing in mind . . . that an unambiguous provision will not be controlled or modified by a doubtful or ambiguous provision." *In re Estate of Shaw*, 69 Wn.2d 238, 242, 417 P.2d 942 (1966).

¶24 Second, even if "heirs at law" were not expressly distinguished from "lawful descendants" by the provisions of the will, treating the terms defined in the will as "lawful descendants" (children, issue) as though there were instead defined simply as "descendants" would be to simply ignore the modifier, giving it no effect. It is precisely for this reason that nearly every court that has examined the question has determined that the phrase "lawful" must be interpreted to mean born from legally married parents. *See, e.g., Kane*, 130 Misc. 2d at 283; *Presley*, 782 S.W.2d at 489. Simply disregarding the presence of modifying language in a will provision is also directly contradictory to Washington law. *See, e.g., Bergau*, 103 Wn.2d at 435 ("the will must be considered in its entirety and effect must be given every part thereof").

¶25 Finally, if the term "lawful" were in fact ambiguous as used in Josephine Wright's will, the extrinsic evidence in the record that could then be considered in ascertaining Josephine Wright's intent with respect to the provision would justify affirming the trial court's decision. Myron Wright expressly listed his "lawful descendants" in his own will. Patterson was omitted. When Patterson attempted to establish paternity and intervene in the probate of Myron Wright's will, Josephine Wright was herself the administratrix of Myron Wright's estate and vigorously opposed Patterson's claims both of paternity and of entitlement to recover under the will, paternity notwithstanding. The provisions of Myron Wright's will were for all practical purposes identical to those in Josephine Wright's will. There is nothing whatsoever in the record suggesting that Josephine Wright had a wholesale change of heart with respect to Patterson's claims in the period between her husband's death and her own. Under these circumstances, Patterson's assertion that Josephine Wright intended to

devise a substantial portion of her estate to Patterson is not credible.

## IV

▮▮ ¶26 Patterson next contends that, if the trial court correctly concluded on the basis of Josephine Wright's will that Josephine Wright intended to limit her bequest to the children of married parents, then enforcement of the will necessarily violates the equal protection clause of the Fourteenth Amendment to the United States Constitution.[7] We disagree. The equal protection clause applies to actions by states, not individuals. Because giving effect to the intent of an individual as manifested in a will does not constitute state action for purposes of the equal protection clause, Patterson's constitutional challenge is meritless.

¶27 Patterson primarily bases her argument on two United States Supreme Court opinions, *Reed v. Campbell*, 476 U.S. 852, 106 S. Ct. 2234, 90 L. Ed. 2d 858 (1986), and *Trimble v. Gordon*, 430 U.S. 762, 97 S. Ct. 1459, 52 L. Ed. 2d 31 (1977). In both cases, the Court declared unconstitutional validly enacted state statutes that affirmatively disinherited out-of-wedlock children in cases of intestacy. *Reed*, 476 U.S. at 853, 856; *Trimble*, 430 U.S. at 764-65, 776. However, because both cases addressed legislative enactments that, by definition, applied only in the absence of individual testamentary intent, there was no question in either case that state action was present. Indeed, the *Trimble* Court itself specifically explained that the statute that it was addressing was unlike the "the disposition of property by will," in which, presumably, "an individual could, if he wished, disinherit his illegitimate children."

---

[7] Patterson does not mention the Washington State Constitution, and the authority to which she cites with respect to this issue exclusively addresses the federal constitution. Accordingly, nothing in Patterson's appeal can be construed as raising a separate, state constitutional challenge. *See State v. Brown*, 132 Wn.2d 529, 594-95, 940 P.2d 546 (1997) ("This Court will address a state constitutional claim only if the claimant sufficiently briefs the *Gunwall* factors." (citing *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986))).

*Trimble*, 430 U.S. at 775 n.16. The only other authority upon which Patterson relies is *Bank of N.Y.*, in which the New York court stated that "[t]o construe 'issue' in a will as excluding illegitimate children otherwise entitled to inherit thereunder, is, as stated before, nothing more than the substitution of judicial preference for a testator's intent. Such preference, under the guise of judicial construction, we believe, is State action." *Bank of N.Y.*, 53 A.D.2d at 66.

¶28 The personal representative correctly notes that this statement, by its own terms, does not apply when the testatrix includes a modifier signifying her intent to limit the disposition of her estate to children of married parents, that the statement would be dicta if it were so applied, and that, in any event, it has not been so applied in New York at any time subsequent to the *Bank of N.Y.* decision. *See, e.g.*, *Kane*, 130 Misc. 2d at 283. Moreover, the personal representative correctly observes that every jurisdiction that has actually examined whether giving effect to such terms in a will constitutes state action for purposes of the equal protection clause has concluded that it does not. *See Harris Trust*, 145 Ill. 2d at 175; *Powers v. Wilkinson*, 399 Mass. 650, 655, 506 N.E.2d 842 (1987); *Traders Bank*, 711 S.W.2d at 876 n.2; *In re Dumaine*, 135 N.H. 103, 109, 600 A.2d 127 (1991). The superior court's decision did not violate Patterson's rights under the equal protection clause.

V

¶29 The personal representative also raises the equitable defenses of waiver, estoppel, and laches to any claim that Patterson might have to recover under the terms of Josephine Wright's will. Because we hold that the terms of the will specifically exclude Patterson as a potential beneficiary, we need not address whether Patterson's claims would also be barred by these defenses.

VI

¶30 Similarly, Patterson devotes a significant portion of her brief to contending that a Kansas trial court order

vacating her adoption is entitled to full faith and credit as the valid judgment of a sister state. However, the effect of the Kansas order is relevant only to Patterson's legal paternity, an issue not addressed by the superior court. Moreover, given our resolution of the questions presented herein, the issue is also not relevant to the distribution of Josephine Wright's estate. Accordingly, we also decline to address Patterson's arguments concerning what effect, if any, the Kansas order might have had were Patterson within the class of beneficiaries defined by the terms of Josephine Wright's will.

## VII

¶31 Finally, the personal representative requests attorney fees on appeal pursuant to RAP 18.1. TEDRA specifically provides that attorney fees are available on appeal, but are awardable solely at the discretion of the court: "any court on an appeal may, in its discretion, order costs, including reasonable attorneys' fees, to be awarded to any party . . . [f]rom any party to the proceedings." RCW 11.96A.150(1)(a). While we resolve the legal issues that Patterson raises in favor of the personal representative, those issues are not frivolous. The personal representative fails to articulate a convincing basis for an award of fees. Accordingly, as did the superior court, we decline the personal representative's request for an attorney fee award.

¶32 Affirmed.

SCHINDLER, C.J., and AGID, J., concur.

Review denied at 166 Wn.2d 1005 (2009).