# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In re the Testamentary Trust of<br><br>GIUSEPPE DESIMONE,<br><br>Deceased.<br><br>DALE COLLINS, a married man,<br><br>Appellant/<br>Cross Respondent,<br><br>v.<br><br>BNY MELLON, N.A.; JOSEPH R.<br>DESIMONE and RICHARD L.<br>DESIMONE, JR., in their capacities as<br>Co-Trustees of the Testamentary Trust<br>OF GIUSEPPE DESIMONE.<br><br>Respondents/Cross<br>Appellants. | No. 69929-6-I<br>(Consolidated with Nos.<br>70094-4-I and 70120-7-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED<br><br>FILED: <u>March 31, 2014</u> |

Cox, J. — "The primary duty of a court called upon to interpret a will is to ascertain the intent of the testator."[1] If possible, the testator's intent should be "derived from the four corners of the will and the will must be considered in its entirety."[2] "[T]he testator's intentions, as viewed through the surrounding

---

[1] In re Estate of Mell, 105 Wn.2d 518, 524, 716 P.2d 836 (1986).

[2] Id.

circumstances and language, are determined as of the time of the execution of the will."[3]

Here, Giuseppe Desimone executed a will in 1943 that created a trust that provided for income to his children and their "issue." The language of the will, the then-existing law, and other circumstances in 1943 show that Giuseppe intended that "issue" not include those born outside of wedlock.[4] Accordingly, Dale Collins, whose biological mother was never married to Giuseppe's son, does not take under the will and trust. We affirm the grant of summary judgment to respondents. We also deny attorney fees on appeal to all parties.

The material facts are generally undisputed. Giuseppe and his wife owned and operated the Pike Place Market and also owned extensive other real property in King County.

In 1943, Giuseppe executed a will that created a trust funded by half of the extensive community estate. The will instructed that the remainder of the income of the trust be annually divided among his five children who were all listed in the will. Mondo Desimone was one of these five children of Giuseppe and his wife.

The will further instructed that if Giuseppe's children died, leaving "issue ([Giuseppe's] grandchildren)," then the child's share would pass to the issue. The will also provided that if his grandchildren died, leaving "issue ([Giuseppe's]

---

[3] Id.

[4] We use the first name of the testator and adopt the naming conventions of others for purposes of clarity.

great-grandchildren)," then the grandchild's share would pass to the grandchild's issue.

Giuseppe died in 1946. Mondo died in 1996.

In 2012, Dale commenced this TEDRA proceeding, claiming that he is Giuseppe's grandchild and a beneficiary of the trust. Dale claims that in 2008 he started to investigate whether Mondo was his biological father. Dale asserts that he learned that in 1948 his mother worked at a stall in the Pike Place Market, where Mondo owned a flower shop. He alleges that his mother, who was married to another man at the time, had a brief affair with Mondo, who was also married to someone else at the time. According to Dale, he was born as a result of this affair.

Respondents BNY Mellon, N.A., Joseph Desimone and Richard Desimone Jr., are co-trustees (collectively the "Co-Trustees") of the trust. Benjamin Danieli is the personal representative of the estate of Jacqueline Danieli, Mondo's daughter, and Karen Danieli, Liza Taylor, and Maria Danieli are some of Giuseppe's great grandchildren and beneficiaries of the trust (collectively the "Danieli Beneficiaries"). Catherine Ross is another beneficiary, appearing pro se. These parties all appear to dispute whether Dale is Giuseppe's biological grandchild.

The parties made cross motions for summary judgment. For purposes of this motion, the court did not decide whether Dale is Giuseppe's biological grandchild. The trial court granted the Co-Trustees' and the Danieli Beneficiaries' motions for summary judgment, which Catherine had joined. The

court also denied Dale's motion for summary judgment. Finally, the trial court denied the motions for awards of attorney fees under TEDRA by the Co-Trustees and the Danieli Beneficiaries.

Dale appeals. The Co-Trustees and the Danieli Beneficiaries cross-appeal.

## INTENT OF TESTATOR

Dale asserts that, according to the terms of Giuseppe's will, he is not excluded from the class of trust income beneficiaries. We hold that the testator's intent, as evidenced by the language in the will and the surrounding circumstances in 1943, show that Dale is not included within the class of income beneficiaries of the trust.

Summary judgment is properly granted when the pleadings and affidavits show there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.[5] The interpretation of a will is a question of law that we review de novo.[6]

"The primary duty of a court called upon to interpret a will is to ascertain the intent of the testator."[7] While a will speaks at the time of the testator's death, "the testator's intentions, as viewed through the surrounding circumstances and language, are determined as of the time of the execution of the will."[8]

---

[5] CR 56(c).

[6] In re Estate of Curry, 98 Wn. App. 107, 112-13, 988 P.2d 505 (1999).

[7] Mell, 105 Wn.2d at 524.

[8] Id.

4

If possible, the testator's intent should be "derived from the four corners of the will and the will must be considered in its entirety."[9] "When, after reading the will in its entirety, any uncertainty arises about the testator's intent, extrinsic evidence . . . may be admitted to explain and resolve the ambiguity."[10]

"The testator is presumed to be familiar with the 'surrounding circumstances' that could affect the will's construction."[11] A testator is also "presumed to have known the law at the time of execution of his will."[12] Additionally, "Technical words in a will are presumed to be used in their legalistic sense."[13]

Here, the material provisions of Giuseppe's will state:

> 4. The remainder of the income of this Trust shall be annually divided between and paid to my children aforenamed.
>
> In the event that any of my said children shall die leaving ***issue (my grandchildren)*** surviving them, then the share of the income to which such child would have been entitled if alive shall be annually divided between and paid to its issue on the basis of one portion thereof to each male issue and one half portion thereof to each female issue.
>
> In the event that any of my said children shall die leaving no issue, then the share of such deceased child shall go to and be divided amongst my surviving children and the issue of any deceased children, the issue of any deceased child receiving the

---

[9] Id.

[10] Id.

[11] In re Estate of Price, 73 Wn. App. 745, 754, 871 P.2d 1079 (1994) (quoting In re Estate of Bergau, 103 Wn.2d 431, 436, 693 P.2d 703 (1985)).

[12] Mell, 105 Wn.2d at 524.

[13] Erickson v. Reinbold, 6 Wn. App. 407, 420, 493 P.2d 794 (1972).

share which such deceased child would have taken if alive and dividing it among themselves on said basis of one portion thereof for each male child and one half-portion thereof for each female child.

In the event that any of my grandchildren shall die leaving *issue (my great-grandchildren)* then the share to which such deceased grandchild would have been entitled if then alive shall go to and be paid annually to its issue, my great-grandchildren, on the basis of one share to each male issue of such deceased grandchild and one half-share to each female issue thereof.

In the event of the death of any of my great grandchildren while it shall still be entitled to any part of this Trust, the share which such great grandchild would have taken if alive shall go to and be divided amongst the surviving issue of the grandchild through whom such great grandchild was taking, on the aforesaid basis of one portion thereof for each male child and one-half portion thereof for each female child.[14]

To determine whether Giuseppe intended to include within the term "issue" an alleged grandchild born out of wedlock, we look first to the language of the will and then to the surrounding circumstances in 1943. That is when Giuseppe executed his will creating the trust.

Giuseppe used the term "issue" throughout his will, but this instrument does not contain any definition for the term. Because "issue" is a technical word, we presume that it was used in its "legalistic sense."[15] To determine its "legalistic sense," we look to the intestacy statutes in effect in 1943.

---

[14] Clerk's Papers at 42-43 (emphasis added).

[15] Erickson, 6 Wn. App. at 420.

Under the intestacy statutes, Rem. Rev. Stat. § 1354 provides that "[t]he word 'issue,' as used in this chapter, includes all the *lawful* lineal descendants of the ancestor."[16]

In the case In re Estate of Wright, this court considered whether the term "lawful descendants" used in a will included children born outside of wedlock.[17] This court concluded that "'lawful' must be interpreted to mean born from legally married parents."[18]

Here, given that "issue" only included "*lawful* lineal descents" under the intestacy statutes in 1943, the use of the term "issue" in Giuseppe's will included only "lawful issue" or grandchildren born of parents married to each other.

Additionally, Giuseppe's will was prepared by a lawyer who presumably knew the legal definition of "issue" at the time. In the case, In re Estate of Price, the supreme court considered whether a testator intended for his grandchildren to inherit.[19] The testator's will stated that he left the residue of his estate to his "surviving children."[20] The supreme court affirmed the trial court, which determined that the testator did not intend for his grandchildren to inherit based on the language of the will.[21] In part of its reasoning, the supreme court

---

[16] Rem. Rev. Stat. § 1354 (1931) (emphasis added).

[17] 147 Wn. App. 674, 676, 196 P.3d 1075 (2008).

[18] Id. at 685.

[19] 75 Wn.2d 884, 886-90, 454 P.2d 411 (1969).

[20] Id. at 886.

[21] Id. at 887-90.

explained that the will was drafted by an "attorney, who presumably advised the testator of the law of intestacy."[22] "If the testator had wanted to provide for grandchildren, it would have been easy to do so in the customary way . . . ."[23]

Similarly, here, Giuseppe's will was drafted by a lawyer who presumably advised Giuseppe of the meaning of "issue" in 1943. If Giuseppe intended to include *all* issue, without regard to marital status of parents, his lawyer could have used different language in the will.

Given the technical language in the will and the surrounding circumstances at the time Giuseppe executed it in 1943, we conclude that his use of the term "issue" was intended to limit the income beneficiaries of the trust to his grandchildren of parents married to each other. Because Dale is not within this class of beneficiaries, he is not entitled to any income from the trust.

Dale contends that the will's use of the term "issue (my grandchildren)" and "issue (my great grandchildren)" changes or broadens the meaning of "issue." He focuses on the words in the parentheses that follow each use of the term "issue." Accordingly, Dale argues that under the ordinary meaning of "grandchildren," he would qualify as an income beneficiary.

We read the will to use the term "issue" primarily to describe each class of income beneficiaries. The parenthetical use of the terms "grandchildren" and "great-grandchildren," respectively are used secondarily to clarify the tier of distribution.

---

[22] Id. at 888.

[23] Id.

8

For example, the term "issue" is used consistently throughout the will. But the parenthetical explanation of "grandchildren," for one tier of distribution is used to distinguish the term "great-grandchildren" in another tier of distribution. Thus, contrary to Dale's argument, the use of these latter words does not change or broaden the scope of "issue." Rather, these latter words in the parentheses only provide clarification as to which "issue" Giuseppe was referring.

Dale next asserts that when Giuseppe executed his will in 1943, the term "issue," without reference to the intestacy statutes, included "all descendants." Dale's support for this argument is solely based on language in a 1930 supreme court case, Bowles v. Denny.[24] Reliance on that case is misplaced.

There, the supreme court considered whether the term "issue" included a specific generation of descendants.[25] In doing so, the court stated that "'[i]n its general sense, unconfined by any indication of intention to the contrary, the word issue includes in its meaning *all descendants*.'"[26] The court cited cases outside this state and other authorities to support, by its own words, this general statement.[27] This general statement does not control here.

First, the supreme court considered the general meaning of "issue" in an entirely different context than in this case. The Bowles court did not consider

---

[24] Brief of Appellant at 7 (citing Bowles v. Denny, 155 Wash. 535, 541, 285 P. 422 (1930)).

[25] Bowles, 155 Wash. at 539-40.

[26] Id. at 541 (emphasis added) (internal quotation marks) (quoting Drake v. Drake, 134 N.Y. 220, 224, 32 N.E. 114 (1892)).

[27] Id.

whether the term "issue" included grandchildren born out of wedlock, as is the case here. Thus, the general statement in that case does not apply to the issue in this case.

Second, other authorities have recognized that the term "issue" in the 1940s did not include grandchildren born out of wedlock. For example, in Powers v. Wilkinson, the Massachusetts Supreme Court recognized in 1987 that the meaning of this term had evolved over time.[28] It quoted a case from 1947, which stated,

> "We can hardly regard this as an open question in this Commonwealth. It cannot be doubted that by the common law of a few generations ago such words as issue, children, descendants, and so forth as descriptive of a class in a grant, devise, or legacy, in the absence of anything indicating a contrary intent, meant only persons of the class who were born in lawful wedlock."[29]

These other authorities, more on point than Bowles, show that the general understanding of the term "issue" in the 1940s did not include children born out of wedlock.

Dale also argues that Wright, a 2008 case, supports the conclusion that the absence of the term "lawful" means that Giuseppe meant to include grandchildren born out of wedlock.[30] We disagree with that reasoning.

In Wright, this court concluded that "the use of the term 'lawful descendants' in a will manifest[ed] the intent on the part of a testatrix to limit a

---

[28] 399 Mass. 650, 653-54, 506 N.E.2d 842 (1987).

[29] Id. at 654 (quoting Fiduciary Trust Co. v. Mishou, 321 Mass. 615, 634, 75 N.E.2d 3 (1947)).

[30] Brief of Appellant at 9 (citing Wright, 147 Wn. App. at 685).

class gift to children of married parents."[31] Because no Washington case had examined the meaning of the modifier "lawful," this court looked to other jurisdictions.[32] It explained, "The great majority of courts that have examined the question have concluded that, when used in a testamentary instrument to modify words such as 'children,' 'issue,' or 'descendants,' the word 'lawful' must be read as representing the intent to limit a bequest to children of legally married parents."[33]

Dale cites this case to argue that the "converse" of Wright is true.[34] Because Giuseppe did not use the word "lawful" to modify "issue," Dale contends that Giuseppe intended to include grandchildren born out of wedlock in the class. But Wright does not properly stand for the converse reading.

Wright was interpreting a will executed in 1992.[35] Consequently, as we previously discussed in connection with the Massachusetts case, the meaning of "issue" was different from the meaning of this word in 1943. According to the general understanding of this term in 1943, it would have been redundant to use the term "lawful issue." Dale does not cite to any authority other than Wright to explain how the absence of the word "lawful" is significant given the general meaning of "issue" in 1943. Thus, not including "lawful" in this case does not

---

[31] Wright, 147 Wn. App. at 676.

[32] Id. at 681.

[33] Id. at 682.

[34] Brief of Appellant at 9 (citing Wright, 147 Wn. App. at 685).

[35] Wright, 147 Wn. App. at 677.

reveal Giuseppe's testamentary intent to include grandchildren born out of wedlock in the class of income beneficiaries.

Dale also argues that intestacy statutes are inapplicable to determining intent of testators in wills. His point is that we should not look to the intestacy statutes in existence at the time the will was executed for the definition of "issue."[36] We reject this argument.

First, he argues that the definition for "issue" plainly states that it is limited to the intestacy chapter.[37] While the statutory definition states that the "word 'issue,' *as used in this chapter*, includes all the lawful lineal descendants of the ancestor," the emphasized phrase does not necessarily bar us from looking to this definition to determine the then general understanding of the term "issue."[38] The intestacy statutes are part of the surrounding circumstances that we can look to when construing the will.[39]

Second, Dale also cites Wright to argue that the definition of "issue" is inapplicable in this case.[40] There, this court stated, "It bears observing, of course, that the laws of intestacy are by definition inapplicable when the

---

[36] Brief of Appellant at 8 (citing Wright, 147 Wn. App. at 683).

[37] Id. at 8 n.2 (quoting Rem. Rev. Stat. § 1354).

[38] Rem. Rev. Stat. § 1354 (emphasis added).

[39] See Price, 73 Wn. App. at 754 ("The testator is presumed to be familiar with the 'surrounding circumstances' that could affect the will's construction.").

[40] Reply Brief of Appellant at 2 (citing Wright, 147 Wn. App. at 683).

decedent leaves a will."[41] But the analysis we outlined previously in this opinion does not do this. Rather, the definition is one source to help us determine the general understanding of this term in 1943.

Alternatively, Dale asserts that if the intestacy laws are relevant to the interpretation of the will, the court must look to the law applicable when the class of income beneficiaries is ascertained. Currently, the intestacy statutes do not determine who "issue" may be based on the marital status of their parents.[42] We are not persuaded that this change in the intestacy statutes warrants a departure from the general rule that we determine the intent of the testator at the time of the making of a will, not some time thereafter.

To support this alternative argument, Dale makes two assertions that rely on In re Trust of Sollid.[43] There, Division Three considered whether adopted children were income beneficiaries for their adoptive grandparents' trust.[44] The trust provided: "'Upon the death of the last of the three named beneficiaries, then the corpus of the trust shall be delivered and paid to the then surviving *issue*, including lineal descendants, of the three beneficiaries, per stirpes.'"[45] The court concluded that the term "issue," under then current law, included "'all the lawful

---

[41] Wright, 147 Wn. App. at 683.

[42] See RCW 11.02.005; 11.04.081.

[43] Brief of Appellant at 10 (citing In re Trust of Sollid, 32 Wn. App. 349, 647 P.2d 1033 (1982)).

[44] Sollid, 32 Wn. App. at 351.

[45] Id. at 357 (emphasis added).

lineal descendants of the ancestor and all lawfully adopted children.'"[46] Accordingly, the court applied the then current statute and concluded that the adopted children were "issue."[47]

The respondents in that case argued that Division Three should not rely on the current statute because it was "not in effect at the time the trusts were executed."[48] Division Three rejected that argument based on a number of reasons including the following: (1) "several courts have upheld retroactive application of liberalized adoption statutes," and (2) "the settlor was presumed to understand that a statute fixing the rights of an adopted child would be subject to change; thus, a statute requiring adopted children be treated as trust beneficiaries was retroactively applied."[49]

Citing Sollid's first reason, Dale argues that we should retroactively apply the liberalized statutes regarding grandchildren born out of wedlock.[50] Currently, RCW 11.04.081 states, "For the purpose of inheritance to, through, and from any child, the effects and treatment of the parent-child relationship shall not depend upon whether or not the parents have been married." The current definition for

---

[46] Id. (quoting RCW 11.02.005(4)).

[47] Id.

[48] Id.

[49] Id.

[50] Reply Brief of Appellant at 8-10 (citing Sollid, 32 Wn. App. at 357).

"issue" is "*all* the lineal descendants of an individual."[51] We decline this invitation to extend the rationale of Sollid to this case.

Generally, statutes are presumed to have prospective application only.[52] Dale fails to cite any case where RCW 11.04.081 was held to have any retroactive application. Additionally, Sollid and the cases it relies on involved adopted children.[53] Dale is not an adopted child.

Citing Sollid's second reason, Dale argues that we should presume that Giuseppe understood that rights of grandchildren born out of wedlock would be subject to change when he executed his will.[54] For this proposition, the Sollid court cited Wilmington Trust Co. v. Huber.[55] In Wilmington, a trust was created in 1951, at a time when Delaware law treated adopted children differently than "natural born" children.[56] But in 1952, a statute was enacted that "drastic[ally] change[d]" the law to treat adopted children and "natural born" children the

---

[51] RCW 11.02.005(8) (emphasis added).

[52] Whidbey Envtl. Action Network v. Island County, 122 Wn. App. 156, 180 n.65, 93 P.3d 885 (2004).

[53] See Sollid, 32 Wn. App. at 357 (citing Purifoy v. Mercantile-Safe Deposit & Trust Co., 273 Md. 58, 327 A.2d 483 (1974); Peele v. Finch, 284 N.C. 375, 200 S.E.2d 635 (1973); In re Estate of Wehrhane, 149 N.J. Super. 41, 372 A.2d 1365 (1977)).

[54] Reply Brief of Appellant at 8 (citing Sollid, 32 Wn. App. at 357).

[55] Sollid, 32 Wn. App. at 357 (citing Wilmington Trust Co. v. Huber, 311 A.2d 892 (Del. Ch. 1973)).

[56] Wilmington, 311 A.2d at 893-94.

same.[57] The Delaware court explained that the trustor is presumed to "understand that a statute fixing the rights of an adopted child is subject to change in futuro."[58]

The problem with this approach is that it departs from the well-established principle that "the testator's intentions, as viewed through the surrounding circumstances and language, are determined *as of the time of the execution of the will.*"[59] Based on this record, it is entirely speculative to conclude that Giuseppe thought about how the rights of grandchildren born out of wedlock could change in the future. Thus, this argument is not persuasive.

Next, Dale cites two Delaware cases, Annan v. Wilmington Trust Co. and Haskell v. Wilmington Trust Co., for the "modern rule" regarding the law that determines a class of beneficiaries.[60] In Annan, the Delaware Supreme Court considered whether children born out of wedlock were included within the term "issue" in a trust instrument.[61] The court explained, "Read in their entirety, the trust instruments do not indicate whether illegitimate children fall under the definition of 'issue.' The term is not defined in the documents. Furthermore, the circumstances surrounding the creation of the trusts do not tend to support one

---

[57] Id.

[58] Id. at 895.

[59] Mell, 105 Wn.2d at 524 (emphasis added).

[60] Brief of Appellant at 10-11 (citing Annan v. Wilmington Trust Co., 559 A.2d 1289 (Del. 1989); Haskell v. Wilmington Trust Co., 304 A.2d 53 (Del. 1973)).

[61] Annan, 559 A.2d at 1292-93.

definition of 'issue' over another."[62] It is not clear why the court came to the conclusion that the meaning of "issue" was not apparent, but it did note that the terms "issue" and "lineal descendants" were used interchangeably in the trusts.[63]

Because the trustor's intent was not clear, the court applied the "modern rule."[64] Citing Haskell, the court explained, "'the applicable law to the determining of a class following the termination of a life interest is the law as it exists on the date of ascertainment, unless the documents themselves demonstrate a clear intent on the part of the creator to limit the class as it was defined by law on the date of execution of the trusts.'"[65]

First, Dale does not cite a Washington case to show that our courts follow this "modern rule." Moreover, this case is distinguishable from Annan. There, the court applied the "modern rule" only after it determined that the trust instrument and the surrounding circumstances did not reveal the testator's intent.[66] Unlike Annan, the language in Giuseppe's will and the surrounding circumstances make his intent clear. Thus, even if the "modern rule" could apply, it would not here. For these reasons, Dale's reliance on these cases is not persuasive.

---

[62] Id. at 1292 (citations omitted).

[63] Id. at 1292 n.1.

[64] Id.

[65] Id. (quoting Haskell, 304 A.2d at 54).

[66] Id.

17

In sum, the trial court did not err when it granted the Co-Trustees' and the Danieli Beneficiaries' motions for summary judgment. The will and the surrounding circumstances show that Giuseppe's intent, at the time the will was executed, was not to include grandchildren born out of wedlock in the class of income beneficiaries.

## ATTORNEY FEES

Dale seeks fees on appeal. The Co-Trustees and the Danieli Beneficiaries cross-appeal arguing that the trial court abused its discretion when it denied their requests for attorney fees. They also request fees on appeal. We hold that the trial court did not abuse its discretion in denying fees. Moreover, we do not award fees to anyone on appeal.

The basis for all fee requests is RCW 11.96A.150(1), which states that "the superior court or any court on an appeal may, in its discretion, order costs, including reasonable attorneys' fees, to be awarded to any party: (a) From any party to the proceedings." Attorney fees may be awarded "in such amount and in such manner as the court determines to be equitable."[67] This court may "consider any relevant factor, including whether a case presents novel or unique issues."[68]

This court reviews a trial court's decision to award or deny fees under this statute for abuse of discretion.[69]

---

[67] RCW 11.96A.150(1).

[68] In re Guardianship of Lamb, 173 Wn.2d 173, 198, 265 P.3d 876 (2011).

[69] In re Estate of Black, 153 Wn.2d 152, 173, 102 P.3d 796 (2004).

Dale does not make a persuasive case for the award of fees on appeal. Likewise, the Co-Trustees and the Danieli Beneficiaries fail to show that the trial court abused its discretion in denying fees. And they fail to make a persuasive case for fee awards on appeal. The case authority on which they rely is, in our view, unpersuasive for various reasons.[70] Accordingly, we deny all requests for fees on appeal.

We affirm the summary judgment orders before us, the denial of attorney fees below, and deny all requests for attorney fees on appeal.

Cox, J.

WE CONCUR:

_____

---

[70] See Villegas v. McBride, 112 Wn. App. 689, 697, 50 P.3d 678 (2002) (awarding fees to the estate where the appellants failed to comply with procedural requirements, the litigation deprived the decedent's children of part of their inheritance, and the decedent's estate was not a wealthy one); In re Boris V. Korry Testamentary Marital Deduction Trust for Wife, 56 Wn. App. 749, 756, 785 P.2d 484 (1990) (concluding that the trial court did not abuse its discretion when it awarded fees to another party from the trust corpus and not the charities because there was no evidence of "bad faith" on the part of the charities, the charities made a "plausible argument," and the charities were "heavily burdened by their own fees and costs").